**E-FILED**
Wednesday, 07 November, 2012  05:58:06 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

JASON LEE NIEMAN,                              )
                                               )
                 Nieman,                       )     Case No. 11 CV 3404
                                               )
vs.                                            )     The Honorable Richard Mills
                                               )     Magistrate Judge G. Cudmore
GRANGE MUTUAL CASUALTY                         )
COMPANY AND INTEGRITY MUTUAL                   )
INSURANCE COMPANY,                             )
                                               )
                 Defendants.                   )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Jason Nieman ("Nieman") sued Defendants Grange Mutual Casualty Company ("Grange") and Integrity Mutual Insurance Company ("Integrity") for age discrimination (Counts I and VII) and retaliation (Counts II, V, and VIII) for no other reason than to conduct a "scheme to harass or threaten parties, non-parties and Counsel in the hopes of obtaining a settlement." *See* Doc. No. 74, p. 7, 12. Nieman began this litigation without any evidence of discrimination or retaliation and, now, more than one year later, Nieman still has absolutely no evidence of discrimination or retaliation. Most significantly, it has remained undisputed throughout this litigation that Nieman, age 42, was substantially the same age as the candidate selected for Integrity's Vice President of Claims position ("VP of Claims"), Christian Martin ("Martin"), age 39. (Fact ¶¶ 23, 27, 28). It has remained undisputed that Cindy Heindel ("Heindel"), the Integrity Vice President who rejected Nieman's candidacy, had no knowledge of Nieman's prior protected activity. (Fact ¶¶ 5, 34, 42, 49). For these two reasons, and a host of additional deficiencies, Defendants should be awarded summary judgment.

<u>**MATERIAL FACT SUMMARY**</u>

Integrity provides insurance services for multiple lines of insurance coverage, including workers compensation coverage.  (Fact ¶ 1).  Integrity began a search for a VP of Claims in February 2009, which concluded with the selection of Martin, age 39, in June 2011.  (Fact ¶¶ 7, 23).  Over the course of its search, Integrity reviewed 133 candidates.  (Fact ¶ 13).

Jason Nieman, age 42, was phone screened by Cindy Heindel for Integrity's VP of Claims on February 11, 2010 – and failed to qualify for further consideration.  (Fact ¶¶ 26-28).  Nieman's candidacy lasted less than one hour.  (Fact ¶ 26).

The reasons Heindel disqualified Nieman are straightforward:

- Nieman was "long winded" in answering Heindel's questions.

- Nieman "talked over" (i.e., interrupted) Heindel.

- Nieman's corporate impact at one employer was – "snickety-snack time".

- Nieman's corporate impact at another employer was – "providing headsets".

(Fact ¶ 29).  Integrity Vice President Heindel explained her decision to disqualify Nieman:

> In my telephone interview, there were a number of things that you [Nieman] did not satisfactorily answer, including there are a number of times that you talked over me, you interrupted me, so I was very uncomfortable with your communication skills.  The quality of your responses was very weak in some instances, not strategic at all.  You know, at this level of position, I'm really looking for someone that is a broad big picture thinker that's going to contribute at a vice president level, and answers that you gave, such as snickety-snack time, such as referencing your biggest impact to the company was headsets was very weak, was really at, what I would consider, maybe a response a manager level candidate may give, but certainly not the quality of response that a VP level candidate would give.
>
> * * *
>
> ...based on how the telephone interview went, I didn't feel comfortable that I could put you in front of a board of directors.
>
> * * *

2

So I very clearly had decided within that hour that I was not considering you further.

(Fact ¶ 36).  Nieman's deficiencies were so evident, Heindel did not complete her standard interview questions and, instead, disqualified Nieman before the phone interview ended.  (Fact ¶¶ 28, 29).

Heindel kept comprehensive handwritten notes of her interview, which Nieman admitted accurately "recorded what transpired during the interview."  (Fact ¶¶ 31, 32).  These notes included references to "snickety-snack time" and "headsets" as well as the boxed in comment:

long winded
talks over you

(Fact ¶ 33).  The length of Heindel's notes (five pages) further reflects Nieman's long winded responses to her questions.  (Fact ¶ 31).

After sending Heindel a thank you letter on February 11, 2010, Nieman never communicated with Heindel again for the remaining 16 months of the VP of Claims search.  (Fact ¶ 38).  Nieman did not contact Heindel, even once, to find out where he stood – or if he had been disqualified, why.

## UNDISPUTED MATERIAL FACTS

1.    Grange Mutual Casualty Company ("Grange") and Integrity Mutual Insurance Company ("Integrity") provide insurance services for multiple lines of insurance coverage, including workers compensation coverage.  (Heindel Dec.[1] ¶1)

2.    Integrity provides insurance services only in Wisconsin, Minnesota, and Iowa. (Heindel Dec. ¶2)

3.      Integrity's headquarters are in Appleton, Wisconsin and Grange's headquarters are in Columbus, Ohio.  (Heindel Dec. ¶3)

4.      Integrity employs approximately 110 employees and has a seven person executive team consisting of President & CEO, Vice President of Sales and Marketing, Vice President of Claims, Vice President of Human Resources and Administration, Vice President of Personal Lines and Vice President of Commercial Lines, and Director of Finance.  (Heindel Dec. ¶4)

5.      Cindy Heindel ("Heindel") was Integrity Vice President of Human Resources from June 2007 to July 2011 and has been Integrity's Vice President of Human Resources and Administration since that date.  (Heindel Dec. ¶6)

6.      Joe DiMartino ("DiMartino") has been Integrity's President since May 23, 2010 and Integrity's President and CEO since February 14, 2011.  (DiMartino Dec.[2] ¶3)

7.      Integrity began a search for Vice President of Claims ("VP of Claims") in February 2009, which concluded with the selection of Christian Martin ("Martin") in June 2011. (Heindel Dec. ¶7; DiMartino Dec. ¶4)

8.      During the search period Sue Frantzen ("Frantzen"), candidate number 22 on Exhibit F, a Grange management employee, filled the Integrity Claims leadership position on an interim basis commuting from her northern Illinois residence.  (Frantzen Dec.[3] ¶2; DiMartino Dec. ¶5; Exhibit F)

---

[1]   Cindy Heindel's Declaration is attached hereto as Exhibit A.

[2]   Joe DiMartino's Declaration is attached hereto as Exhibit B.

[3]   Sue Frantzen Declaration is attached as Exhibit C.

9.      Frantzen was asked whether she would be willing to accept the Integrity claims leadership position on a permanent basis.  (Frantzen Dec. ¶4)

10.      Frantzen declined because she did not wish to relocate to Appleton, Wisconsin. (Frantzen Dec. ¶4)

11.      Frantzen's date of birth is June 29, 1961.  (Frantzen Dec. ¶5)

12.      Integrity solicited candidates by a job posting that remained substantially the same throughout the search.  (Heindel Depo.[4] 44-46; *see also* Integrity's job posting, exhibit 1 to Heindel's deposition, attached hereto as Exhibit E)

13.      Resumes and/or applications for Integrity's VP of Claims were submitted by 133 candidates.  (VP Claims Search Timeline and Candidate History, Exhibit 8 to Cindy Heindel's Deposition, attached hereto as Exhibit F)

14.      Except for a maternity leave of absence in Spring 2009, Heindel managed the VP of Claims search and conducted all initial phone screens.  (Heindel Dec. ¶8)

15.      Heindel's phone screens followed a standard format concluding with three questions specifically designed for interviews of Vice President level candidates, including a question concerning corporate metrics.  (Heindel Depo. 55-59)

16.      12 of the 133 candidates received phone interviews by Integrity's CEO.  (Exhibit F)

17.      12 of the 133 candidates received face to face interviews.  (Exhibit F)

18.     10 of the 12 candidates who received phone interviews with the CEO were older than age 42.  (Heindel Dec. ¶10)

19.     9 of the 12 candidates who received face to face interviews were older than age 42.  (Heindel Dec. ¶11)

20.     In May 2009, the VP of Claims job was offered to Jim Blair ("Blair"), candidate number 2 on Exhibit F.  (Heindel Dec. ¶13; Exhibit F)

21.     Blair was 57 years old at the time of this job offer.  (Heindel Dec. ¶14)

22.     Blair declined the job offer because he did not wish to relocate to Appleton, Wisconsin.  (Heindel Dec. ¶15)

23.     Martin, candidate number 31 on Exhibit F, was age 39 in June 2011 when he was offered the VP of Claims job.  (Heindel Dec. ¶16; Exhibit F)

24.     Heindel added: (a) 6 executive recruiters, (b) 3 job search websites, and (c) Integrity's website as additional recruiting sources after March 1, 2010.  (Exhibit F)

25.     Candidate number 15 (out of 133) on Exhibit F was Jason Nieman ("Nieman"). (Heindel Dec. ¶21; Exhibit F)

26.     Heindel phone screened Nieman on February 11, 2010 for less than one hour. (Heindel Depo. 66, 71-72; Nieman Depo.[5] 24; Cindy Heindel's notes from her telephone

---

[4]    The cited pages of Cindy Heindel's deposition are attached as Exhibit D.

[5]    The cited pages of Jason Nieman's deposition are attached as Exhibit G.

screening of Jason Nieman, Exhibit 2 to Jason Nieman's Deposition, attached hereto as Exhibit

H; Complaint ¶14)

27.    Nieman was 42 (DOB July 20, 1967) years old when he was phone screened.

(Jason Nieman's EEOC Charge, Exhibit A to his Complaint)

28.    Heindel rejected Nieman's candidacy during the phone screen and did not

complete all three questions normally asked of Vice President candidates including the question

regarding corporate metrics.  (Heindel Depo. 94, 97-101, 103-104)

29.    Heindel disqualified Nieman because he: (a) was long winded in his answers, (b)

talked over (i.e., interrupted Heindel), (c) gave "snickety-snack time" as an example of corporate

impact at one employer, and (d) gave providing "headsets" as an example of corporate impact at

another employer.  (Heindel Depo. 71-73)

30.    Heindel testified:

> Q  ...Where in this whole process did you decide that you were gonna
> disqualify this candidate [Nieman]?
>
> A  ...It probably was at some point when I realized how much you [Nieman]
> were rambling on and on, not answering my questions, talking over me.  At
> the point that – you know, most candidates can kind of get a sense of the flow
> of the interview, what I'm asking for, because I'll ask follow-up questions in
> there to try to move things along a little bit more quickly, and most candidates
> – many candidates can pick up on that.  You didn't pick up on that.  And so
> somewhere within that time frame where I clearly felt that you were just
> talking on and on so much, I likely determined that I wasn't gonna consider
> you further.
>
> * * *
>
> So I very clearly had decided within that hour that I was not considering you
> further.

(Heindel Depo. 99-102).

31.     Heindel took five pages handwritten notes during her phone interview with Nieman.  (Heindel Depo. 102; Exhibit H)

32.     Heindel's notes accurately "recorded what transpired during Nieman's interview." (Nieman Depo. 26)

33.     Heindel's notes specifically reference "snickety-snack time" and "headsets" as well as the boxed in comment:

> long winded
> talks over you

(Exhibit H)

34.     Heindel was the only person involved in the decision to disqualify Nieman. (Heindel Dec. ¶19; DiMartino Dec. ¶6)

35.     Heindel relied solely upon her phone interview with Nieman to disqualify him from further consideration for Vice President of Claims.  (Heindel Depo. 71-72; (Heindel Dec. ¶20)

36.     In her deposition, Heindel explained her decision to disqualify Nieman:

In my telephone interview, there were a number of things that you [Nieman] did not satisfactorily answer, including there are a number of times that you talked over me, you interrupted me, so I was very uncomfortable with your communication skills.  The quality of your responses was very weak in some instances, not strategic at all.  You know, at this level of position, I'm really looking for someone that is a broad big picture thinker that's going to contribute at a vice president level, and answers that you gave, such as snickety-snack time, such as referencing your biggest impact to the company was headsets was very weak, was really at, what I would consider, maybe a response a manager level candidate may give, but certainly not the quality of response that a VP level candidate would give.

* * *

...based on how the telephone interview went, I didn't feel comfortable that I could put you in front of a board of directors.

* * *

So I very clearly had decided within that hour that I was not considering you further.

(Heindel Depo. 71-72).

37.     When debriefing recruiter Jeff Gipson about Nieman's phone screen, Heindel told Gipson that Nieman was long winded, talked over Heindel, and that "I could never put him [Nieman] in front of my Board of Directors."  (Heindel Depo. 155-157, 181; Jeff Gipson's February 11, 2010 Note regarding Nieman's telephone interview with Heindel, Exhibit 38 to Heindel's deposition, attached hereto as Exhibit J)

38.     After sending Heindel a thank-you letter on February 11, 2010, Nieman never communicated with Heindel again during the remaining 16 months of the VP of Claims search. (Nieman Depo. 25-26)

39.     Jeff Gipson sent Heindel an e-mail on March 15, 2010, listing five candidates by rank.  Nieman was not even on the list.  (Jeff Gipson's March 15, 2010 email, Exhibit 35 to Heindel's deposition, attached hereto as Exhibit K.)

40.     In September 2010, Heindel asked Gipson to confirm the availability of three candidates who she had not previously interviewed.  (Heindel Depo. 108-109, 182-185, Ex. 8)

41.     Heindel never referred Nieman to Joe DiMartino, CEO, for consideration. (Heindel Depo. 117-122)

42.     Heindel did not conduct nor utilize an internet search for any VP of Claims candidate, including Nieman.  (Heindel Depo. 212; Heindel Dec. ¶29)

43.     During the phone screenings of candidates, Heindel asked candidates the date on which the candidate graduated from college.  Heindel explained:

> It's an interview technique that I use.  I really don't care at all what year they graduated.  What I'm trying to do is...to confirm that, yes, they did indeed graduate, and then more so I'm trying to determine whether or not there's any information that's missing from their resume.  So my next line of questioning then says, so after you graduated, where'd you go to work.  And so I'm trying to determine...if there is anything missing on the resume.

(Heindel Depo. 85).

44.     Graduation dates are an unreliable measure of age as reported by United States Census Bureau, which notes that in 1995, 38% of males enrolled in college were twenty-five years old or older.  (U.S. Census Bureau, Statistical Abstract of the United States: 2012, Table 281. College Enrollment by Sex, Age, Race and Hispanic Origin: 1980 to 2009, Exhibit L).

45.     Heindel has never had a LinkedIn account nor used LinkedIn.  (Heindel Depo. 212).

46.     On July 25, 2012, LinkedIn stated affirmatively in response to Nieman's subpoena that Heindel has never had a LinkedIn Account.  (LinkedIn's July 25, 2012 letter sent in response to Nieman's Subpoena, attached as Exhibit M; *see also* Heindel Dec. ¶26)

47.     Joe DiMartino never heard of Nieman until receiving Nieman's August 4, 2011 demand letter.  (DiMartino Dec. ¶9)

48.     Nieman sued a prior employer in approximately August 2009.  (Nieman Depo. 117)

49.     Heindel first learned about Nieman's lawsuit against a prior employer when Nieman sent a demand letter to DiMartino on August 4, 2011.  (Heindel Dec. ¶22)

50.     Nieman admitted in his deposition on June 27, 2012 that he had no worker's compensation claim management experience in Wisconsin, Minnesota, or Iowa.  (Nieman Depo. 55-57)

51.     Nieman disclosed during his deposition on June 27, 2012, that he uses his current employer's LEXIS, WESTLAW, and computer systems to pursue his personal lawsuits without his employer's express consent.  (Nieman Depo. 21-22)

52.     Nieman disclosed during his deposition on June 27, 2012, that he works on his personal lawsuits during his regular work day without his employer's express consent.  (Nieman Depo. 20-21)

53.     Integrity IT Acceptable Use Policy prohibits unreasonable personal use of Integrity's IT systems subject to discipline up to and including discharge.  (Heindel Dec. ¶ 24, Ex. 1)

54.     Christian Martin had superior communication skills.  (Heindel Dec. ¶ 25, Ex. 2)

55.     Christian Martin had excellent strategic skills.  (Heindel Dec. ¶ 25, Ex. 2)

56.     The Integrity VP of Claims job description includes the following requirements: (1) excellent written and verbal communications skills; (2) strong interpersonal skills and the ability to interact with all levels in the organization; (3) demonstrated leadership ability; and (4) a visionary.  (Exhibit E)

57.     Integrity interviewers described Martin:

- He has professional and calm demeanor.

- Good communication skills.

- Great personality and demeanor – would seem to be a good fit.

- Good communication and depth to responses...he would be a good fit with leadership team.

- Supports overall objectives.

- Understands how to support agents.

- Has change management experience.

- Has a number of experiences that demonstrate his strategic thinking and drive for results.

- His answers to the situational leadership questions were great.

- Understands a business case.

(Heindel Dec. ¶ 25, Ex. 2)

58.     Heindel explained why she considered Martin a viable candidate based on his phone screen:

> ...I kept holding onto it [Martin's candidacy] because there were a lot of things about his telephone interview that I really liked.  His communication skills were very sound – were very strong, he did a great job in watching my questions, answering the questions that I was asking with a lot of depth, the quality of his responses were very high, comparable to what would be a VP level, so I kept coming back to him.

(Heindel Depo. p. 80 ).

59.     Recruiter Jeff Gipson disclaimed any knowledge of discriminatory intent by Integrity.

> Q       Why do you think it's (Nieman's lawsuit) not valid?
>
> A       Because I don't know of any discrimination that transpired in regard to this situation.
>
> Q       You don't know that it didn't; do you?
>
> A       I'm pretty sure it did not.
>
> Q       Why?
>
> A       Because Integrity, I've worked with them for a long time.  I've never seen any signs of discrimination from this organization in any way, shape, manner, or form.  We submitted many candidates to this job, all of which were screened out, some of which were more qualified,....

(Gipson Dep.[6] 67)

60.    Recruiter Mike Tingley disclaimed any knowledge of discriminatory intent by Integrity.

> 8.     At no time was there ever a discussion between me and Ms. Heindel about Mr. Nieman's age.  Furthermore, at no time did I ever believe or suspect that Integrity was eliminating candidates based on age.  In fact, I believed that persons over 40 were being seriously considered by Integrity....
>
> 9.     ...Furthermore, at no time did I ever believe that Cindy Heindel, Integrity and/or Grange was disqualifying older workers based upon their age.
>
> 10.    ...More importantly, at no time did I ever state or believe that Integrity was discriminating against older workers.

(Tingley Dec. ¶¶8, 9, and 10)

61.    Recruiter Jeff Gipson and Heindel both testified Heindel never asked Gipson to contact Nieman again after he was disqualified on February 11, 2010.  (Gipson Depo. 18, 40-41; Heindel Depo. 108-109)

62.    Executive Recruiter Jeff Gipson confirmed worker's compensation management experience was an extremely important qualification:

...for example...Does it [job description] say anything about work comp experience?  No, it does not.  But did that come out progressively through the process?  Yes, it did.

* * *

I recall generally that Integrity had been eliminating other candidates, including some I had submitted, without strong worker's compensation experience and that this may have been a concern regarding Mr. Nieman.

(Gipson Depo. 52-54).

63.     Executive Recruiter Mike Tingley confirmed worker's compensation

management experience was an extremely important qualification:

I recall generally that Integrity had been eliminating other candidates, including some I had submitted, without strong worker's compensation experience and that this may have been a concern regarding Mr. Nieman.

(Tingley Dec. ¶7)

64.     Mr. Gipson controlled the manner and method in which he found and submitted

candidates to Integrity.  (Heindel Dec. ¶30)

65.     Mr. Gipson did not have the authority to affect the Defendants' legal relationships

with third-parties.  (Heindel Dec. ¶31)

66.     Mr. Tingley controlled the manner and method in which he found and submitted

candidates to Integrity.  (Heindel Dec. ¶32)

67.     Mr. Tingley did not have the authority to affect the Defendants' legal

relationships with third-parties.  (Heindel Dec. ¶33)

---

6    The Cited pages of Jeff Gipson's deposition are attached as Exhibit N.

68.     Messrs. Gipson and Tingley worked on a contingency basis so that they received no compensation unless they successfully placed a candidate.  (Tingley Dec.[7] ¶6; Gipson Depo. 9; Heindel Dec. ¶34)

69.     Nieman admitted during his deposition that he does not have direct evidence of age discrimination.  (Nieman Depo. 64-65, 117-120))

70.     Nieman admitted during his deposition that he does not have direct evidence of retaliation and that his claim is based on supposition.  (Nieman Depo. 66-67, 103-104, 109-110)

---

[7]    Mike Tingley's Declaration is attached as Exhibit O.

## ARGUMENT

Nieman cannot establish, through direct or indirect evidence, that Heindel disqualified him for the VP of Claims position because of his age or his prior protected activity.  Nieman's age discrimination claim fails for many reasons, but first and foremost because Martin is nearly the same age as Nieman.  Nieman's retaliation claim also fails for many reasons, but first and foremost because Heindel never had any knowledge of Nieman's prior protected activity.

Nieman's claims from the outset have been "highly speculative" and little more than a vehicle for Nieman to harass and attempt to intimidate Defendants into an unwarranted settlement.  Now, Nieman has reached the point in the litigation where mere speculation, conclusory assertions and vague aspersions are not sufficient to support his claim.  Defendants respectfully request that this Court grant summary judgment in their favor.

## I.      Legal Standard

"Summary judgment is the put up or shut up moment in a lawsuit" where a "hunch about the defendant's motives" cannot save a plaintiff's claim and speculation, conjecture and hypotheses must be ignored in favor of admissible evidence. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment.  Instead, the court relies on the non-moving party to identify the evidence which creates a genuine issue of triable fact.  *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.    As A Matter Of Law, Nieman Cannot Establish Age Discrimination.

### A.    Nieman Has No Direct Evidence of Age Discrimination.

Nieman admitted in his deposition he has no direct evidence of age discrimination.  (Fact ¶ 69).  Nieman has not offered, and cannot offer, any direct evidence Heindel considered his age when she rejected him as a candidate for VP of Claims.

"Evidence offered under the direct method 'must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus.'"  *Van Antwerp v. City of Peoria,* 627 F.3d 295 (7th cir. 2010) (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)); *see also Mach v. Will County Sheriff,* 580 F.3d 495 (7th Cir. 2009); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, (7th Cir. 2003).  Nieman can offer no such evidence, nor is there any.  To the contrary, the evidence is cumulative that Heindel did not consider Nieman's age in making her decision.

Evidence that conclusively demonstrates no age discrimination occurred includes:

1.    10 of the 12 candidates who were referred for phone interviews with the CEO were older than age 42. (Fact ¶ 18).

2.    9 of the 12 candidates who received face to face interviews were older than age 42.  (Fact ¶ 19).

3.    Sue Frantzen, age 50, the interim VP of Claims, was asked by both Joe DiMartino (President & CEO) and Peter McMurtrie (Grange VP) whether she would accept VP of Claims on a permanent basis, but she declined because she did not wish to relocate to Appleton, Wisconsin.  (Fact ¶¶ 8-11).

4.    Jim Blair, age 57, was offered the VP of Claims position but declined because he did not wish to relocate.  (Fact ¶¶ 20-22).

5.    Martin, who ultimately accepted the VP of Claims position, is substantially the same age as Nieman.  (Fact ¶¶ 23, 27).

All of the evidence unequivocally establishes that age played no role in Heindel's decision to reject Plaintiff's candidacy for the VP of Claims.

Nor does Heindel's request for college graduation dates indicate otherwise.  Heindel explained:

> ...It's an interview technique that I use.  I really don't care at all what year they graduated.  What I'm trying to do is...to confirm that, yes, they did indeed graduate, and then more so I'm trying to determine whether or not there's any information that's missing from their resume.  So my next line of questioning then says, so after you graduated, where'd you go to work.  And so I'm trying to determine...if there is anything missing on the resume.

(Fact ¶ 43).  Heindel's reasoning is rational and business justified.[8]  Nieman cannot identify any direct evidence of age discrimination.

### B.    Nieman Cannot Establish Age Discrimination Through Indirect Evidence.

Under the indirect method of proof for an age discrimination claim, Nieman first must present a *prima facie* case of discrimination by establishing that he: (a) was a member of the protected group; (b) sought a position for which he was qualified; (c) was not hired; and (d) a substantially younger person who was similarly situated was hired.  *Sembos v. Philips Components*, 376 F.3d 696, 700 (7th Cir. 2004); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903-04 (7th Cir. 2005).  Nieman cannot establish a *prima facie case* because (1) he was not qualified for the VP of Claims position, (2) Martin is not substantially younger than Nieman, and (3) Martin is not similarly-situated to Nieman.  Even if Nieman could establish a *prima facie* case of discrimination, which he cannot, his claim also fails because he cannot establish pretext.

### 1.    Nieman Is Not Qualified To Be VP of Claims.

Nieman bears the burden of showing he is qualified for the VP of Claims position.  *See, e.g., Ellis v. Bradley*, 2009 U.S. Dist. LEXIS 4973, 11-12 (N.D. Ill. Jan. 23, 2009) (Ex. P)

---

[8]    Graduation dates are an unreliable measure of age as reported by United States Census Bureau, which notes that in 1995, 38% of males enrolled in college were twenty-five years old or older, meaning they had extended or deferred their college careers. (Fact ¶ 41).

3:11-cv-03404-RM-BGC   # 93   Page 19 of 29

(granting summary judgment because the plaintiff could not establish she was qualified).  In this

case, Nieman cannot establish that he was qualified for Integrity's VP of Claims position.

Nieman lacked the communication skills necessary for a Vice President, as well as the required

level of strategic skills.  (Fact ¶¶ 29, 36, 37, 54-57).  Nieman demonstrated his lack of

communication skills by repeatedly talking over Heindel during the telephone interview and

giving long winded answers.  (Fact ¶¶ 29, 36).[9]  Nieman's examples of having a corporate

impact were organizing "snickety-snack" time and obtaining headsets for other employees.  (Fact

¶ 29).  In a small company like Integrity with only seven executives, each Vice President must

have a strong sense of corporate mission and possess the strategic skills to accomplish that

mission.  (Fact ¶ 56, 58).  "Snickety-snack time" and "headsets" assuredly do not reflect these

skills.  These answers were "certainly not the quality of response that a VP level candidate would

give."  (Fact ¶¶ 36, 37).

When compared to the Job Description, it is evident that Nieman was not qualified:

| Job Description | Nieman Deficiency |
|---|---|
| Excellent written and verbal communications skills | Long winded and talks over others |
| Strong interpersonal skills and the ability to interact with all levels in the organization | Talks over, interrupts others<br>Long winded |
| Demonstrated leadership ability | Snickety-snack time, headsets<br>Talks over others |
| Visionary | Snickety-snack time and headsets as examples of corporate impact |

(Fact ¶¶ 29, 56).  Nieman failed to satisfy even the basic qualifications in the Job Description.

---

[9]   This Court can take judicial notice of Nieman's long-winded discourse by reviewing his voluminous
pleadings and submissions in this litigation.

Further, Nieman lacked the requisite workers' compensation experience.  Executive

Recruiters Jeff Gipson and Mike Tingley confirmed worker's compensation management

experience was an extremely important qualification:

> ...for example...Does it [job description] say anything about work comp
> experience?  No, it does not.  But did that come out progressively through the
> process?  Yes, it did.
>
> * * *
>
> I recall generally that Integrity had been eliminating other candidates, including
> some I had submitted, without strong worker's compensation experience and that
> this may have been a concern regarding Mr. Nieman.

(Fact ¶¶ 62, 63).  Both recruiters fully understood the successful candidate would need to have

strong worker's compensation management experience in Integrity's markets.  (Fact ¶¶ 62, 63).

Integrity provides insurance services in only three states, Wisconsin, Minnesota, and

Iowa.  (Fact ¶ 2).  Nieman admitted he had no worker's compensation management experience in

any of the three states where Integrity does business.  (Fact ¶ 50).  Not only did Nieman lack

strong worker's compensation experience, he had none at all in any of Integrity's three markets.

Nieman also has demonstrated his willingness to abuse corporate assets for his personal

use.  Integrity, like most companies, maintains policies to protect the use and integrity of its

information technology systems and equipment.  (Fact ¶ 53).  In essence, these policies proscribe

unreasonable personal use of Integrity's IT systems.  (Fact ¶ 53).  Yet, Nieman openly admitted

he not only uses his employer's IT systems for his personal litigation, he uses his employer's

LEXIS and WESTLAW accounts for his personal lawsuits – all without express consent, or even

any discussion with his employer.  (Fact ¶ 51).  These actions are unreasonable under Integrity's

policies and would be grounds for discharge if Nieman were an Integrity employee, making him

unqualified for Integrity's VP of Claims.  (Fact ¶ 53).

Nieman would not have been hired to be Integrity's VP of Claims if he were the only candidate, leave out one of 133 candidates.

### 2.    Integrity Did Not Hire A Substantially Younger Person.

Nieman's age discrimination claim also fails as a matter of law because he cannot establish a substantially younger person was hired for the position he sought. *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997); *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (U.S. 1996). "The Seventh Circuit has defined 'substantially younger' as generally ten years younger." *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003) (citing *Hartley*, 124 F.3d at 893)).

Nieman was forty-two years old when Heindel rejected him for the VP of Claims on February 11, 2010 (Fact ¶¶ 27, 28), while Martin was thirty-nine years old when Integrity hired him. (Fact ¶ 23). The Seventh Circuit has held the exact age difference between Nieman and Martin is insufficient to establish a *prima facie* case of age discrimination.

In *Hoffman*, the Seventh Circuit granted summary judgment to the employer because the age gap between a forty-two year old and thirty-nine year old was insufficient to establish the requisite age difference for a *prima facie* case. *Hoffmann v. Primedia Special Interest Publs.,* 217 F.3d 522, 525 (7th Cir. 2000). Based on the three year age gap, the Seventh Circuit held a presumption was "created by the fact that [the plaintiff's] replacement was almost the same age-- that age had nothing to do with [the employer's] actions." *Id.*

Similarly, in *Richter*, the plaintiff, "52 years old, was only seven years older than his replacement Kellner, who was 45 years old." *Richter v. Hook-SupeRx*, 142 F.3d 1024, 1029 (7th Cir. 1998). The Seventh Circuit found this seven-year age gap to be "presumptively insubstantial" and upheld summary judgment. *Id.* Similarly, in *Hartley*, the Seventh Circuit

upheld summary judgment where there was a six-to-seven year age difference. *Hartley,* 124 F.3d at 893. Seventh Circuit precedent is clear. The three-year age gap between Martin and Nieman is presumptively insubstantial and defeats Nieman's age discrimination claim.

### 3. Christian Martin Is Not Similarly Situated To Nieman.

Martin is not similarly situated to Nieman because Martin is much better qualified than Nieman, particularly with regard to the communication and strategic skills Nieman lacked.

In contrast to Nieman's communication defects, Integrity interviewers described Martin:

- He has professional and calm demeanor. Good communication skills.
- Great personality and demeanor – would seem to be a good fit.
- Good communication and depth to responses...he would be a good fit with leadership team.

(Fact ¶ 57). Martin's markedly superior communication skills more than set him apart, illuminating why Nieman is unqualified. (Fact ¶ 54).

Similarly, in contrast to Nieman's "snickety-snack time" and "headset" examples of corporate impact, interviewers described Martin:

- Supports overall objectives.
- Understands how to support agents.
- Has change management experience.
- Has a number of experiences that demonstrate his strategic thinking and drive for results.
- His answers to the situational leadership questions were great.
- Understands a business case.

(Fact ¶ 57). Martin's noteworthy strategic skills stand in stark contrast to Nieman's complete lack of strategic vision. (Fact ¶ 55).

Heindel explained why she considered Martin a viable candidate based on his phone screen:

> ...I kept holding onto it [Martin's candidacy] because there were a lot of things about his telephone interview that I really liked. His communication skills were very sound – were very strong, he did a great job in watching my questions,

answering the questions that I was asking with a lot of depth, the quality of his
responses were very high, comparable to what would be a VP level, so I kept
coming back to him.

(Fact ¶ 58).  Martin's skill set is substantially the same as the skill set the Seventh Circuit held

sufficient to find the successful candidate was not similarly situated to the plaintiff in *Foster v.*

*Principal Life Ins. Co.,* 247 Fed. Apx. 836, 839 (7th Cir. 2007) (Ex. Q).  To be similarly situated,

Martin must be directly comparable to Nieman in all material respects, which Martin most

certainly is not.  *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th cir. 2002).

### 4.      As A Matter Of Law, Nieman Cannot Establish Pretext.

Even if Nieman could establish a *prima* facie case of discrimination, which he cannot, his

claim still would fail because Nieman cannot show pretext; that Heindel's reason for rejecting

his application "was a lie—not just an error, oddity, or oversight." *Van Antwerp v. City of*

*Peoria*, 627 F.3d 295, 297-299 (7th Cir. 2010); *see also Essex v. UPS*, 111 F.3d 1304, 1310 (7th

Cir. 1997) ("[t]he fact that the employer was mistaken or based its decision on bad policy, or

even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual").

Nieman cannot point to any record evidence that Heindel's reasons for rejecting his VP of

Claims candidacy was a lie.  In the notes Heindel took contemporaneously during Nieman's

telephone interview, she highlighted in a separate box: "Long winded.  Talks over you."  (Fact

33).  Heindel's notes specifically reference Nieman's discussion of "snickety-snack" time and

headsets.  (Fact  33).  Following her interview with Nieman, Heindel "specifically told [Gipson]

that [Nieman] talked over me, that [Nieman was] long-winded, and that I couldn't put [Nieman]

in front of our board of directors."  (Fact ¶ 37).

Martin's communications skills, manners, strategic thinking and leadership were far

superior to Nieman.  The Seventh Circuit has recognized explicitly that Heindel not only can, but

should take into account these qualities when making a hiring decision.  In *Blise*, the Seventh

Circuit explained, "there is no doubt that an interview also allows an interviewer to get a sense of

the applicant's personality, poise, and manners. These are all traits that are in the eye of the

beholder and all traits that any employer would surely like to have a sense of before making a

hiring decision…. A subjective analysis of the varying traits of each applicant is entirely

appropriate."  *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005).  It is Heindel's opinion,

not Nieman's opinion, that matters for summary judgment.  *Balderston v. Fairbanks Morse*

*Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003) (plaintiff's "own belief that he

was the best candidate is irrelevant to the question of pretext"); *see also Stephens*, 569 F.3d at

788 ("to create an inference of retaliation based upon a difference in credentials, [a plaintiff]

must offer more than 'mere self-serving appraisals",… or his own subjective belief that he was

as qualified as the successful applicant.").

     The Seventh Circuit has "repeatedly stressed that we do not sit as a superpersonnel

department where disappointed applicants or employees can have the merits of an employer's

decision replayed to determine best business practices."  *Blise*, 409 F.3d at 867.  In *Blise*, the

Seventh Circuit, in upholding summary judgment explained, "[the plaintiff] may be right--she

may be more qualified than [the successful candidate], and [the successful candidate] may not be

qualified at all--but so long as [the employer] genuinely believed differently (and Blise offers us

no evidence that its agents did not), it is entitled to act on that belief."  *Id*. at 867-868.  The

Seventh Circuit precedent is clear: Nieman cannot establish pretext in this case and summary

judgment should be granted to Defendants.

**III.     As A Matter Of Law Nieman Cannot Establish A Retaliation Claim.**

**A.     Nieman Admits He Does Not Have Direct Evidence Of Retaliation.**

To establish retaliation by the direct method of proof, Nieman must show: (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is a casual connection between the protected activity and adverse action.  *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 686 (7th Cir. 2008).  Nieman admitted during his deposition he has no direct evidence of retaliation, and accordingly cannot meet this standard.  (Fact ¶ 66).

**1.     Heindel Did Not Know About Nieman's Protected Activity.**

To establish a retaliation claim, Nieman must show that Heindel knew he engaged in protected activity when she made the decision to disqualify him.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006).  "It is not sufficient that [Heindel] could or even should have known about [Nieman's] complaint; [Heindel] must have had actual knowledge of the complaints for [her] decisions to be retaliatory."  *Id.* (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004)).  Heindel testified she had no knowledge of Nieman's lawsuit against Nationwide until Nieman's demand letter, 18 months after Heindel disqualified him. (Fact ¶¶ 26-29, 42 ,49).  Nieman's empty speculation to the contrary is insufficient to overcome summary judgment.  *See, e.g., Palermo v. Clinton*, 784 F. Supp. 2d 936, 949 (N.D. Ill. 2011) (granting summary judgment because "Palermo fatally relies upon his own personal speculation that Defendant's actions were taken in retaliation for Palermo's protected activity.").

In *Tomanovich,* the Seventh Circuit upheld summary judgment, explaining that the plaintiff's "retaliation claim against INDOT fails under both the direct and indirect methods, because, among other reasons, [the plaintiff] failed to present sufficient evidence that INDOT knew of [the plaintiff's] protected activities."  *Tomanovich*, 457 F.3d at 670; *see also Hayes v.*

*Potter*, 310 F.3d 979, 982-83 (7th Cir. 2002) ("A supervisor cannot retaliate if she did not know of the protected activity.").

There is absolutely no evidence to suggest Heindel had any idea that Nieman had sued his former employer.  Just as in *Tomanovich*, Nieman's retaliation claim must fail.

### 2.      There Is No Casual Connection Between Nieman's Nationwide Lawsuit and Heindel's Decision To Disqualify Him.

Nieman also must present admissible evidence that Heindel disqualified him for VP of Claims because of Nieman's protected activity.  *Norman-Nunnery v. Madison Area Tech. College*, 625 F.3d 422, 433-434 (7th Cir. 2010).  Nieman cannot meet this burden and summary judgment should be awarded to Defendants for this reason as well.

Heindel made the decision to reject Nieman's application for the VP of Claims position on February 11, 2010 during her telephone interview with Nieman:

> Q      ...Where in this whole process did you decide that you were gonna disqualify this candidate [Nieman]?
>
> A      ...It probably was at some point when I realized how much you [Nieman] were rambling on and on, not answering my questions, talking over me. At the point that – you know, most candidates can kind of get a sense of the flow of the interview, what I'm asking for, because I'll ask follow-up questions in there to try to move things along a little bit more quickly, and most candidates – many candidates can pick up on that.  You didn't pick up on that.  And so somewhere within that time frame where I clearly felt that you were just talking on and on so much, I likely determined that I wasn't gonna consider you further.
>
> * * *
>
> So I very clearly had decided within that hour that I was not considering you further.

(Fact ¶ 30).  Heindel testified that it was so obvious during the telephone interview that she would not consider Nieman further for the position, that she did not finish asking the standard interview questions.  (Fact ¶¶ 28, 30).  Nieman provides no contrary evidence.

**B.      Nieman Cannot Establish Indirect Evidence Of Retaliation.**

In order to establish a *prima facie* case of retaliation under the indirect approach, Nieman must establish that: (1) he engaged in statutorily protected activity; (2) he was qualified for the position; (3) he was not hired; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Moser*, 406 F.3d at 903-04.  If Nieman establishes the *prima facie*, the burden shifts to Defendants to present a nondiscriminatory reason for rejecting Nieman's candidacy, which Defendants have done.  *Id.* at 904.  Thus, the burden shifts back to Nieman to demonstrate that the Defendants' reason is pretextual, which Nieman cannot do.  *Id.*

**1.      Nieman Cannot Establish That Heindel Knew He Engaged In Protected Activity.**

Just as Heindel's lack of knowledge of Plaintiff's protected activity is fatal to Plaintiff's retaliation claim under the direct evidence method, it also dooms Plaintiff's indirect evidence. *Tomanovich*, 457 F.3d at 670 ("Tomanovich's retaliation claim against INDOT fails under both the direct and indirect methods, because, among other reasons, Tomanovich failed to present sufficient evidence that INDOT knew of Tomanovich's protected activities."); *Mmubango v. Leavitt*, 225 Fed. Appx. 393, 396 (7th Cir. 2007) (Ex. R).  Thus, Nieman's retaliation claim also fails under the indirect method of proof.

**2.      Nieman Cannot Establish That He Was Qualified For The Position Or That He Is Similarly-Situated To Martin.**

Nieman cannot establish he was qualified for the VP of Claims or that Martin is similarly-situated to him for the same reasons that Nieman cannot do so for his age discrimination claim.  *Supra*, Sections II.B.1, 3, pp. 6-8, 9-10.

  **3. Nieman Cannot Establish Pretext.**

  Even if Nieman could establish a *prima facie* case of retaliation, which he cannot,

Nieman cannot establish pretext for the same reasons he cannot do so for his age discrimination

claim.  *Supra*, Section II.B.4, pp. 10-12.

**<u>CONCLUSION</u>**

  Integrity Mutual Insurance Company and Grange Mutual Casualty Company respectfully

request that this Court dismiss with prejudice Jason Nieman's Complaint, award Defendants'

their attorneys' fees and costs and any other relief deemed just.

Dated: November 7, 2012      Respectfully submitted,
                Integrity Mutual Insurance Company and
                Grange Casualty Mutual Company

           By:  <u>/s/ Brian P. Paul     </u>
                One Of Its Attorneys

Brian P. Paul
David W. Croysdale
Michael Best & Friedrich LLP
180 N. Stetson Ave., Suite 2000
Chicago, Illinois 60601

28

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2012, I electronically filed the foregoing **Defendants Grange Mutual Casualty Company and Integrity Mutual Insurance Company's Memorandum of Law in Support of Summary Judgment** with the Clerk of the Court using the CM/ECF system.

/s/ Brian P. Paul
Attorney for Defendants Grange Mutual
Casualty Company and Integrity Mutual
Insurance Company
Brian P. Paul, ARDC No. 6280839
Michael Best & Friedrich LLP
180 North Stetson Avenue, Suite 2000
Chicago, Illinois 60601
Phone: (312) 222-0800
E-mail: bppaul@michaelbest.com