IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

JASON LEE NIEMAN,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )     No. 11-3404
                                     )
GRANGE MUTUAL INSURANCE              )
COMPANY and INTEGRITY                )
MUTUAL INSURANCE                     )
COMPANY,                             )
                                     )
          Defendants.                )

## OPINION

RICHARD MILLS, U.S. District Judge:

Plaintiff Nieman warned the Defendants of a "firey [sic] pit of legal process" which could result in a "catastrophic" outcome if Defendants were unwilling to meet his demands.

The Plaintiff followed through and indeed delivered a "firey [sic] pit of legal process," consisting of conduct that was harassing, contumacious and in bad faith, which has subjected him to sanctions.

We conclude that there are no genuine issues of material fact.

Defendants are entitled to summary judgment.

# I. INTRODUCTION

Plaintiff Jason Nieman has filed suit against Defendants Grange Mutual Insurance Company ("Grange") and Integrity Mutual Insurance Company ("Integrity" or collectively, "the Defendants"), asserting a number of claims for age discrimination (Counts I and VII) and retaliation (Counts II, V and VIII).  The Defendants contend they are entitled to summary judgment on all claims.

# II. FACTS[1]

## A. Defendants' background and executive structure

Grange and Integrity provide insurance services for multiple lines of insurance coverage, including workers compensation coverage.  Integrity provides insurance services in Wisconsin, Minnesota and Iowa, and has its headquarters in Appleton, Wisconsin.  Grange's headquarters are in Columbus, Ohio.

---

[1] These facts are taken from the Defendants' alleged material facts that are properly supported.  The Court notes the Plaintiff's response to most of these facts. In most cases, however, instead of relying on evidence in the record, the Plaintiff purports to dispute the allegation on the basis of his own subjective speculation and/or that Defendants cannot be believed, which is not sufficient to create a genuine issue of material fact to oppose summary judgment.  In his Response to the Defendants' Motion, the Plaintiff does not cite any additional material facts.

Integrity has approximately 110 employees and a seven person executive team consisting of President & CEO, Vice President of Sales and Marketing, Vice President of Claims, Vice President of Human Resources and Administration, Vice President of Personal Lines and Vice President of Commercial Lines, and Director of Finance.[2]

Cindy Heindel was Integrity Vice President of Human Resources from June 2007 to July 2011 and has been Integrity's Vice President of Human Resources and Administration since July 2011. The Plaintiff claims that this is a disputed material fact, based on conflicting information provided in the depositions of Heindel and another witness regarding the nature of Heindel's duties and/or knowledge. However, the Plaintiff does not point specifically to any information in the record. Joe DiMartino has been Integrity's President since May 23, 2010, and its President and CEO since February 14, 2011. The Plaintiff states that he has no direct knowledge of this assertion, though he claims it appears to be a disputed material fact

---

[2]The Plaintiff purports to dispute this fact, while also stating that he has no personal knowledge to confirm or deny. He notes that the Defendants' EEO-1 report of September 2010 indicated 113 employees total.

3

based on his allegation that Defendants have consistently lied or contradicted themselves.

## B. Vice President of Claims Search

Integrity began a search for Vice President of Claims ("VP of Claims") in February 2009, which concluded with the selection of Christian Martin in June 2011.   During the search period, Sue Frantzen, a Grange management employee, filled the Integrity Claims leadership position on an interim basis.   She commuted from her northern Illinois residence. Frantzen was asked whether she would be willing to accept the Integrity claims leadership position on a permanent position.   Frantzen, who was born in 1961 and thus was approximately 48 in 2009, stated that she declined the offer because she did not want to relocate to Appleton, Wisconsin.[3]

Integrity solicited candidates by a job posting that remained substantially the same throughout the search.  Resumes and/or applications

---

[3]Without pointing to any contrary evidence in the record, the Plaintiff disputes each of these facts.  He claims that Defendants have continuously lied or contradicted themselves.

4

for the VP of Claims position were submitted by 133 candidates.  Except for a maternity leave of absence in Spring 2009, Cindy Heindel managed the VP of Claims search and conducted all initial phone screens.  The Plaintiff disputes these allegations, claiming once again that the Defendants have lied and contradicted themselves throughout this litigation.  Heindel's phone screens generally followed a standard format.  They typically concluded with three questions specifically designed for interviews of Vice President level candidates, including a question concerning corporate metrics.  Heindel testified that she might not ask each of the three questions if she concluded that a candidate was no longer under consideration.

Twelve of the 133 candidates received phone interviews by Integrity's CEO, a fact which the Plaintiff disputes based on the Defendants' alleged history of lies and misrepresentations.  Twelve of the 133 candidates received face to face interviews.  The Defendants allege that ten of the twelve candidates who received phone interviews with the CEO were older than age 42.  Moreover, nine of the twelve candidates who received face to

face interviews were older than age 42.  Heindel stated that she based this information on college graduation dates or information she researched and obtained from either recruiters or company files after November 4, 2011. The Plaintiff disputes these facts, claiming it does not appear to be verifiable.  He further asserts that Defendants have shifted positions as to whether college graduation dates could be used to estimate the age of individuals.

In May 2009, the VP of Claims job was offered to Jim Blair.[4]  Blair, who was 57 at the time, declined the offer because he did not want to relocate to Appleton, Wisconsin.

In June 2011, Christian Martin was 39 when he was offered the VP of Claims position.  The Plaintiff disputes this allegation on the basis that

---

[4]The Plaintiff purports to dispute this fact, stating:
> This is a disputed material fact.  This statement appears to be true but the Plaintiff has no way to verify it.  Based upon Defendants' prior false statements and evidence of spoliation of evidence by the Defendants, the Plaintiff cannot stipulate to this as an undisputed fact. The Defendants' records show that Mr. Blair was offered the position while Darin Kath was President/CEO.  (Candidate 2; records at Defendants' Bates D 287 to 304).  The strongest evidence of discrimination and retaliation is noted in the record after DiMartino was named present [sic] (and older officer Mary Jo Buchberger, was refused the position, then choosing to "retire.")

he has no way to verify it.  Moreover, he claims that "Heindel has been shown to have falsely sworn and/or pled repeatedly throughout the litigation and as such her affidavit cannot be deemed reliable as to this item."

The Defendants allege Heindel added the following as additional recruiting sources after March 1, 2010: (1) six executive recruiters; (2) three job search websites; and (3) Integrity's website.  The Plaintiff claims that this fact is immaterial and unverifiable.  Candidate number 15 (out of 133) on Exhibit F was Plaintiff Jason Nieman.  The Plaintiff disputes this only regarding the total number of applicants.

C. Plaintiff Jason Nieman's Phone Interview and Candidacy

According to her notes, Cindy Heindel phone screened the Plaintiff on February 11, 2010, for less than one hour.  The Plaintiff disputes this on the basis that he did not time the interview.  The Plaintiff further states that he should have received at least a "CEO telephone" interview based upon the statistical trends of who was interviewed after the phone interview and the number of pages (5) of handwritten notes that Heindel took as to

7

his interview, when compared to the number she took as to other candidates (between 1 and 4 pages).  The Plaintiff was born in 1967 and was 42 at the time of the phone screen.

The Defendants allege Cindy Heindel rejected the Plaintiff's candidacy during the phone screen and did not complete all three questions normally asked of vice president candidates, including the question regarding corporate metrics.  She testified that any response to such a question would have been recorded in a particular spot in her interview notes.  The Plaintiff disputes this allegation, claiming he can find no evidence that he was disqualified during the phone interview.  He further asserts that Heindel's notes reflect that the three questions normally asked of vice president candidates were indeed asked of him.  Moreover, the Defendants have not disputed the Plaintiff's allegation that at the conclusion of the phone interview, Heindel promised that she would follow up with him.

The Defendants claim Heindel disqualified the Plaintiff because he: (1) was long winded in his answers; (2) talked over (i.e., interrupted

Heindel), (3) gave "snickety-snack time" as an example of corporate impact for one employer, and (4) gave providing "headsets" as an example of corporate impact at another employer.  Heindel testified:

> Q. . . . Where in this whole process did you decide that you were gonna disqualify this candidate [the Plaintiff]?
>
> A. . . .  It probably was at some point when I realized how much you [the Plaintiff] were rambling on and on, not answering my questions, talking over me.  At the point that – you know, most candidates can kind of get a sense of the flow of the interview, what I'm asking for, because I'll ask follow-up questions in there to try to move things along a little bit more quickly, and most candidates – many candidates can pick up on that.  You didn't pick up on that.  And so somewhere within that time frame where I clearly felt that you were just talking on and on so much, I likely determined that I wasn't gonna consider you further.

\*\*\*

> So I very clearly had decided within that hour that I was not considering you further.

*See* Heindel Dep. 99-102.

The Plaintiff disputes these proffered reasons.  Although the Defendants' first alleged fact above consists of one sentence, the Plaintiff's response is more than eleven pages.  The Plaintiff asserts that Defendants'

reasons for disqualifying him are subjective, uncorroborated and have shifted; Heindel has testified falsely and her testimony is contradicted by other witnesses; the Defendants have pled or sworn falsely; and the asserted reasons were not the true reasons why the Plaintiff's candidacy was not further considered.  The Plaintiff further contends he believes Heindel's purported handwritten notes are not genuine and/or have been altered since they were created.  The Plaintiff asserts that the record shows he was still under consideration in October 2010, several months after the phone interview.  It was on October 6, 2010, that Recruiter Jeff Gipson telephonically contacted Heindel, less than an hour after Gipson had talked to the Plaintiff.  Although it is not known what was discussed between Gipson and Heindel, the Plaintiff speculates they discussed his continued interest and that he remained under consideration for the VP of Claims position.

As for Heindel's testimony, the Plaintiff disputes the allegations to the extent that Defendants are offering it as proof of anything other than Heindel gave such testimony at her deposition.  The Plaintiff cites many of

the same reasons, contending that Heindel's reasons had shifted by the time of her deposition. Moreover, her reasons for disqualifying the Plaintiff were uncorroborated and inconsistent with her notes and initial explanation. The Plaintiff further asserts that based on the number of pages of notes Heindel took during the Plaintiff's interview, as compared with other candidates, he should have received more consideration.

The Defendants allege Heindel took five pages of handwritten notes during her phone interview with the Plaintiff. The Plaintiff disputes this fact, though he acknowledges he was presented with five pages that purportedly are Heindel's notes. The Plaintiff states he cannot verify the legitimacy of the statement or the documents. Moreover, based on the Defendants' conduct throughout this litigation, the Plaintiff suggests that the documents may have been manufactured or altered. At his deposition, the Plaintiff could not recall anything in Heindel's notes that he believed to be inaccurately recorded. Her notes specifically refer to "snickety-snack time" and "headsets," as well as saying "long winded" and "talks over you." The Plaintiff acknowledges that accurately reflects the items which purport

11

to be Heindel's interview notes. However, he claims that she cannot be trusted. Moreover, the Defendants' "story" has changed several times.

The Defendants allege Cindy Heindel was the only person involved in the decision to disqualify the Plaintiff. They cite the Declarations of Heindel and Joe DiMartino in supporting the assertion. The Plaintiff contends others were involved in considering candidates. He further alleges that he was still under consideration several months after the phone interview. The Plaintiff suggests that the Court's rulings precluding him from contacting non-party Jeff Gipson have prevented him from further discovery as to this issue.

The Defendants allege Cindy Heindel relied solely upon her phone interview with the Plaintiff to disqualify him from further consideration for the Vice President of Claims position. Heindel testified as follows:

> In my telephone interview, there were a number of things that you [the Plaintiff] did not satisfactorily answer, including there are a number of times that you talked over me, you interrupted me, so I was very uncomfortable with your communication skills. The quality of your responses was very weak in some instances, not strategic at all. You know, at this level of position, I'm really looking for someone that is a broad big picture thinker that's going to contribute at a vice president

12

level, and the answers that you gave, such as snickety-snack time, such as referencing your biggest impact to the company was headsets was very weak, was really at, what I would consider, maybe a response a manager level candidate may give, but certainly not the quality of response that a VP level candidate would give.

\*\*\*

. . . based on how the telephone interview went, I didn't feel comfortable that I could put you in front of a board of directors.

\*\*\*

So I very clearly had decided within that hour that I was not considering you further.

*See* Heindel Dep. 71-72.  The Plaintiff strongly disputes this assertion for

the reasons previously noted and because he alleges Heindel has a history

of contradictions and falsehoods and cannot be deemed credible.

The Defendants allege that when debriefing recruiter Jeff Gipson

about the Plaintiff's phone screen, Heindel told Gipson that Plaintiff was

long winded, talked over Heindel, and that "I could never put him in front

of my Board of Directors."  The Plaintiff disputes this assertion for many

of the reasons previously given, including his belief as to Heindel's veracity.

13

The Plaintiff further states that Gipson's sworn testimony and records contradict these statements.

The Defendants allege that after sending Heindel a thank-you letter on February 11, 2010, the Plaintiff never communicated with Heindel again during the remaining 16-month search for the VP of Claims.  The Plaintiff asserts this mis-characterizes the record.  He alleges that he followed up with Gipson and other recruiters, in addition to through Integrity's online job system and Heindel and others at Integrity.  Moreover, Heindel's deposition confirms she was aware of the Plaintiff's continuing interest but did not advise him he had been disqualified until July 2011.

D.  Continued Search for VP of Claims

The Defendants allege Jeff Gipson sent Heindel an email on March 15, 2010, which listed five candidates by rank.  The email read in part:

> Per our discussion on Friday I am sending you a grading of each of the candidates that I submitted over the last week or so for the VP of Claims position.  I have others to submit but an [sic] hesitant to do [so].  If I think any of them are superstars I will go ahead and forward to you.

The Plaintiff's name was not on the list.  The Plaintiff claims that the

14

alleged fact is immaterial and is disputed to the extent it is offered as proof of the Plaintiff's status as of March 15, 2010. The email refers only to candidates that Gipson submitted in the last week. The Plaintiff notes that his phone interview was approximately one month earlier. The Plaintiff further asserts Gipson testified Heindel never told him that Plaintiff was disqualified when they talked after the phone interview. Moreover, Gipson considered the Plaintiff to be a viable candidate long after Heindel suggested he was.

In September 2010, Cindy Heindel asked Jeff Gipson to confirm the availability of three candidates who she had not previously interviewed. The Plaintiff disputes the allegation, especially to the extent that Defendants are suggesting that he was not one of the top three candidates or still being considered at the time. The Plaintiff asserts Gipson called him on October 6, 2010, and asked if he was still interested and available. Gipson called Heindel 45 minutes after he talked to the Plaintiff. It is unknown what, if anything, was discussed in this phone call that lasted 1:06. Based on this evidence and the affidavit of the Plaintiff's wife, the

15

Plaintiff alleges it can be inferred that Gipson called the Plaintiff at Heindel's request on October 6, 2010 to confirm the Plaintiff's continued availability and interest in the position.

The Defendants allege Heindel never referred the Plaintiff to Integrity CEO Joe DiMartino for consideration. The Plaintiff disputes this allegation. He asserts the Defendants have admitted to destroying an email from Heindel to DiMartino dated September 22, 2010. The Plaintiff believes that his resume was attached to the email. Moreover, the Plaintiff claims the Defendants' statement that their sent folder emails are destroyed after 30 days is unsupported and incredible. He further alleges that Defendants have been shown to intentionally damage and destroy material documents.

### E. Allegation of Internet Search as to Candidates

The Defendants allege Cindy Heindel neither conducted nor utilized an internet search for any VP of Claims candidate, including the Plaintiff. The Plaintiff claims the allegation is unresolved and disputed, and that additional discovery is needed. The Plaintiff believes Heindel has testified

falsely regarding her internet searches.  He believes she has accessed

Linkedin.com[5] profiles of candidates and otherwise used the internet to

access information about candidates, such as the Plaintiff.  Moreover, he

contends that research shows that most hiring managers and human

resources personnel use the internet to research candidates.

The Defendants further allege that during phone screenings, Heindel

asked candidates the date on which the candidate graduated from college.

Heindel explained:

> It's an interview technique that I use.  I don't really care at all
> what year they graduated.  What I'm trying to do is . . . to
> confirm that, yes, they did indeed graduate, and then more so
> I'm trying to determine whether or not there's any information
> that's missing from their resume.  So my next line of
> questioning then says, so after you graduated, where'd you go
> to work.  And so I'm trying to determine . . . if there is anything
> missing on the resume.

*See* Heindel Dep. 85.  The Plaintiff disputes the statement, to the extent

that Defendants are offering it as evidence or that it is even believed by

Heindel and/or the Defendants.  The Plaintiff asserts Heindel provided no

---

[5]LinkedIn describes itself as the "World's Largest Professional Network," with over 200 million members in over 200 countries and territories.  *See* www.linkedin.com/about-us.

support for the technique that she uses and suggests she made it up on her own. He contends that her testimony is unreliable, when this technique is considered with what the Plaintiff alleges is evidence of widespread age, race and gender discrimination by the Defendants. The Defendants claim that graduation dates are an unreliable measure of age as reported by the United States Census Bureau, which notes that in 1995, 38% of males enrolled in college were 25 or older. The Plaintiff disputes the allegation.

The Defendants allege Heindel has never had a LinkedIn account nor used LinkedIn. The Plaintiff does not believe the assertion to be true. He states that he is hopeful after further research by LinkedIn Corporation that he will be provided with documentation as to who at Grange and/or Integrity have viewed his profile and/or communicated about him from July 2009 to present.

In a July 25, 2012 letter to the Plaintiff's then-Counsel, in response to a subpoena, LinkedIn stated affirmatively that Heindel has never had a LinkedIn Account. Citing no authority, the Plaintiff disputes this material fact. The Plaintiff states he has learned from an intellectual property lawyer

18

that when a LinkedIn user deletes his or her profile, the data remains for six months and is then permanently deleted.  LinkedIn is able to determine who has viewed an individual's profile back to March 2011.  The Plaintiff contends this is a question of credibility.

Joe DiMartino never heard of the Plaintiff until receiving his August 4, 2011 demand letter.  The Plaintiff disputes this assertion, though he offers nothing in support other than his own speculation and his contention that Defendants have lied and destroyed documents.

The Plaintiff sued a prior employer in 2009.  The Defendants allege Heindel first learned about the Plaintiff's lawsuit against a prior employer when the Plaintiff sent a demand letter to DiMartino on August 4, 2011.  They cite Heindel's Declaration in support of the allegation.  The Plaintiff disputes the assertion, citing only his subjective belief and his consistent claim that Heindel and the Defendants have not been forthcoming.  He further speculates that "Defendants followed the industry norm and used the Internet to research the Plaintiff, discovered his protected conduct, and then quietly and abruptly disqualified him in October 2010."

19

F. Additional Alleged Reasons why Plaintiff is not Qualified

The Defendants have presented several additional reasons why they allege the Plaintiff is unqualified for the VP of Claims.  These reasons are based on information obtained during discovery.

The Plaintiff admitted in his deposition on June 27, 2012, that he had no worker's compensation management experience in Wisconsin, Minnesota, or Iowa.  In other words, the Plaintiff acknowledged that to the best of his recollection, he was never "in charge of a complete claim being resolved" nor did he "manag[e] other people who were responsible for a complete claim being resolved" in Wisconsin, Minnesota, or Iowa.  *See* Nieman Dep. Tr. 55-57.  The Plaintiff argues this is a disputed immaterial fact.  It is immaterial because the Defendants have never offered worker's compensation experience as a reason for his disqualification from consideration.  The allegation is disputed because the Plaintiff disagrees with the Defendants' definition of worker's compensation management experience.

The Plaintiff disclosed during his deposition that he used his current

20

employer's LEXIS, WESTLAW, and computer systems to perform work on his personal lawsuits without his employer's express consent. Moreover, he works on his personal lawsuits during work hours without his employer's express consent. The Plaintiff contends these alleged facts are immaterial and disputed. He contends the allegations are neither admissible nor relevant and are prejudicial. The Plaintiff has his employer's permission to do online case research that relates to his work duties. The Plaintiff appears to acknowledge that he sometimes does research during business hours that relates to his personal lawsuits, though he claims the research increases his knowledge with respect to topics relevant to his work duties. The Plaintiff states that he has never been disciplined or admonished regarding any improper use of work resources. He further states, "Such personal, non-material deviations are permitted by his employer's code of conduct so long as they do not interfere with his duties in any way, which they do not." *See* Doc. No. 106, at 53.

The Defendants allege that the Integrity IT Acceptable Use Policy prohibits unreasonable personal use of Integrity's IT systems. Such

unreasonable personal use is subject to discipline, up to and including discharge. The Plaintiff asserts this allegation is immaterial because he neither was nor is an Integrity employee and is not bound by its policies. He further contends that if the alleged fact is true, it represents a shift regarding the Defendants' justifications for his purported disqualification which may be a pretext for the real reason.

G. Integrity's Selection for VP of Claims

Based on Cindy Heindel's Declaration, the Defendants allege that Christian Martin had superior communication skills and excellent strategic skills. The Plaintiff contends the allegations are immaterial based on the Defendants' statement that Plaintiff was disqualified long before Martin interviewed for the position. The Plaintiff disputes these assertions based on their high level of subjectivity. In disputing the alleged superiority of Martin's communication skills, the Plaintiff also points to Sue Frantzen's Interview Evaluation Form, wherein she states that she had "trouble getting specific detailed answers from [Martin], he gave high level generic responses to jurisdiction specific technical questions. Minimal metrics in place to

manage current department's results."  The Plaintiff uses his own interactions with Martin in disputing that he had excellent strategic skills. Moreover, because they had essentially the same job duties in their previous positions at another insurance company, the Plaintiff states that if Martin's strategic experience was "excellent," then the same would also be true of the Plaintiff.  However, it appears that Defendants are referring to the individuals' strategic skills, not their respective experience.

The Integrity VP of Claims job description includes the following requirements: (1) excellent written and verbal communication skills; (2) strong interpersonal skills and the ability to interact with all levels in the organization; (3) demonstrated leadership ability; and (4) a visionary.  The Plaintiff disputes this assertion, claiming there have been a number of different versions of the job description between the various insurance recruiters, Integrity's own website, and as to the version provided by the Defendants in discovery.  Moreover, he contends that Defendants have also attempted to use these items to justify their conduct, which lacks any objective basis for the Plaintiff's disqualification.

23

Integrity described Martin as follows: (1) professional and calm demeanor; (2) good communication skills; (3) great personality and demeanor – would seem to be a good fit; (4) good communication and depth to responses . . . he would be a good fit with leadership team; (5) supports overall objectives; (6) understands how to support agents; (7) has claims management experience; (8) has a number of experiences that demonstrate his strategic thinking and drive for results; (9) his answers to the situational leadership questions were great; and (10) understands a business case.

The Plaintiff contends the description of Martin consists of disputed immaterial facts. He questions the lengthy delay between Martin's phone interview and his second interview if he possessed the foregoing attributes. Although these comments are in forms provided to the Plaintiff by the Defendants, the Plaintiff questions their legitimacy. He further alleges that one or more forms appears to have been manufactured by the Defendants and/or Cindy Heindel after the Plaintiff filed an EEOC charge. Moreover, the Plaintiff asserts that Heindel's apparent actions in negligently or

24

intentionally destroying emails and/or her own handwritten notes raise further questions.

Cindy Heindel explained why she considered Martin a viable candidate based on his phone screen:

> I kept holding onto it [Martin's candidacy] because there were a lot of things about his telephone interview that I really liked. His communication skills were very sound — were very strong, he did a great job in watching my questions, answering the questions that I was asking with a lot of depth, the quality of his responses were very high, comparable to what would be a VP level, so I kept coming back to him.

*See* Heindel Dep. Tr. 80. While acknowledging this was Heindel's testimony, the Plaintiff disputes it to the extent that it is used to establish that Martin was a superior candidate or that the statements accurately explain the eight-month delay between Martin's first and second interviews. The Plaintiff alleges the statements establish pretext and suggest that evidence was altered and/or manufactured by the Defendants or one of the agents.

H. Recruiters Gipson and Tingley

The Defendants allege Recruiter Jeff Gipson disclaimed any

knowledge of discriminatory intent by Integrity.  Except for acknowledging that Gipson offered such testimony, the Plaintiff claims this is a disputed immaterial fact.  Moreover, Gipson stopped working on this job before the final phases.

The Defendants allege that Recruiter Mike Tingley disclaimed any knowledge of discriminatory intent by Integrity.  Except for acknowledging that Tingley offered such testimony, the Plaintiff claims this is an immaterial fact.  Moreover, the Plaintiff asserts that Tingley said that some employers are committing age discrimination and are "speaking in code" as part of those efforts.  However, the Plaintiff acknowledges that Tingley was not speaking about Integrity or Grange as engaging in such a practice.

Cindy Heindel testified that she never asked Recruiter Jeff Gipson to contact the Plaintiff again after he was allegedly disqualified on February 11, 2010.  Gipson testified that he did not recall Heindel asking him to contact the Plaintiff after that date.  The Plaintiff maintains that Gipson called him on October 6, 2010, in order to ask if he was still interested in the position and available.

26

The Defendants allege that Recruiter Jeff Gipson confirmed worker's compensation management experience was an extremely important qualification.  Gipson testified there was not an emphasis on worker's compensation at the beginning of the process.  He was not aware of the importance of worker's compensation experience at the time of the Plaintiff's interview.  The Plaintiff contends this is further evidence of pretext in that the qualifications for the position changed over time.  The Defendants further allege Recruiter Mike Tingley confirmed worker's compensation management experience was an extremely important qualification.  According to Tingley, candidates without strong experience in that arena were eliminated.  The Plaintiff disputes the allegation for the same reason and asserts it is further evidence of pretext for a discriminatory reason.

Jeff Gipson and Mike Tingley controlled the manner in which they found and submitted candidates to Integrity.  The Defendants allege neither Gipson nor Tingley had the authority to affect their legal relationships with third parties.  The Plaintiff claims these assertions are

immaterial.  Although claiming the allegations are disputed, the Plaintiff acknowledges he has no basis to confirm or deny their veracity.  Jeff Gipson and Mike Tingley worked on a contingency basis and received no compensation unless they successfully placed a candidate.

The Plaintiff admitted during his deposition that he does not have direct evidence of age discrimination.  He further acknowledged that he does not have direct evidence of retaliation and his claim is based on supposition.

## III. DISCUSSION

The Defendants contend that Plaintiff cannot establish, through direct or indirect evidence, that Cindy Heindel disqualified him for the VP of Claims position because of his age or his prior protected activity.  They allege his age discrimination claims fail for several reasons, one of which is that Christian Martin is approximately the same age.  The Defendants further assert that Plaintiff's retaliation claims fail for a number of reasons, primarily because Heindel never had knowledge of any protected activity.  Because they contend that Plaintiff has offered only speculation and

conclusory assertions, the Defendants allege they are entitled to summary judgment as to all claims.

The Plaintiff contends there are material facts which preclude the entry of summary judgment.  The Plaintiff further asserts that procedural defects preclude a grant of summary judgment.  He alleges that Defendants have violated evidentiary rules by introducing attacks on his character, in addition to presenting evidence of settlement negotiations.  The Plaintiff contends that Defendants have destroyed material evidence.  He further alleges that discovery must be reopened.

A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  The Court construes all inferences in favor of the Plaintiff.  *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  *See Harper v. C.R.*

29

*England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. *See id*.

### B. Age Discrimination

In attempting to withstand summary judgment in discrimination cases, a plaintiff may proceed under the direct method or indirect method. *See Fleishman v. Continental Casualty Co.*, 698 F.3d 598, 603 (7th Cir. 2012).

### (1) Direct Method

A plaintiff may meet his burden under the direct method by presenting direct evidence or circumstantial evidence. *See id*. Under the direct method, a plaintiff may produce direct evidence, such as an admission by the employer, or circumstantial evidence that "points directly to a discriminatory reason for the employer's action." *See id*. (citations

omitted).  A plaintiff seeking to create a genuine issue of material fact with circumstantial evidence "must connect the circumstantial evidence to the employment action such that a reasonable juror could infer the employer acted for discriminatory reasons." *Id*.

The Plaintiff admitted in his deposition that he does not have any direct evidence of age discrimination.  "A plaintiff's concession that he lacks evidence to support his case is binding."  *See Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009).  Accordingly, the Court will consider whether the Plaintiff presented sufficient circumstantial evidence of age discrimination under the direct method to create a genuine issue of material fact.

The Court concludes the evidence here shows that no age discrimination occurred.  Based on Cindy Heindel's Declaration, the evidence establishes that ten of the twelve candidates who were referred for phone interviews with the CEO were older than age 42.  Moreover, nine of the twelve candidates who received face to face interviews were older than age 42.  Although the Plaintiff claims to dispute these assertions and

31

questions how Heindel determined the age of the candidates, he provides no evidence creating a factual dispute or casting any doubt on either allegation.

The evidence further shows that Sue Frantzen, age 50, the interim VP of Claims, was asked by Joe DiMartino whether she would accept the VP of Claims position on a permanent basis, but she declined because she did not wish to relocate to Appleton, Wisconsin.  In support of these assertions, the Defendants rely on the Declarations of Frantzen and DiMartino.  The Plaintiff purports to dispute the allegations.   However, he provides no evidence in support of his position, except to argue that Defendants have provided false information and have placed their credibility at issue. Because the Defendants have properly supported their allegations, the Plaintiff's bare denials are not enough to create a factual dispute at this stage.

The evidence further establishes that Jim Blair, age 57, was offered the VP of Claims position but declined because he did not wish to relocate. The Defendants cite Heindel's Declaration in support of the assertion.  The

32

Plaintiff acknowledges that the statements appear to be true, though he has no way to verify them. He claims the facts are disputed but provides no support for the assertion, except to argue that the statement cannot be considered true because of the Defendants' alleged prior false statements and spoliation of evidence. This bare denial is not sufficient to create a factual dispute.

The evidence further establishes that Christian Martin, who ultimately accepted the VP of Claims position, when hired was approximately three years younger than the Plaintiff was when the Plaintiff interviewed for the position. Martin was 39 when he was offered the position in June 2011. The Plaintiff was 42 when he was phone screened on February 11, 2010. Although the Plaintiff admits to his own age, he claims that he has no way to verify Martin's age. The Plaintiff's bare denial and accusation of false testimony is not enough to create a factual dispute.

The Court concludes the undisputed material facts establish that age did not play a role in Cindy Heindel's decision to reject the Plaintiff's candidacy for the VP of Claims position.

The Court further concludes that Heindel's asserted basis for asking a candidate's college graduation date is reasonable and has a business justification. Such an inquiry is an obvious method of determining if the information on a resume is accurate or if there is a gap in a candidate's work history.[6]

Based on the foregoing, the Plaintiff has not presented any circumstantial evidence that points directly to a discriminatory reason for the employment decision. The Plaintiff's hunches about the Defendants' motives are not enough to proceed. *See Springer*, 518 F.3d at 484. Therefore, using the direct method of proof, the Plaintiff has not created a factual dispute regarding whether his candidacy was rejected due to age discrimination.

## (2) Indirect Method

Under the indirect method, a plaintiff may present a prima facie case

---

[6]The Defendants again allege graduation dates are an unreliable measure of age, according to the United States Census Bureau. This is certainly true because many people do not enter college immediately after high school. However, it is equally true that a candidate who graduated from college 20 or more years ago is probably over the age of 40. Therefore, an individual's college graduate date can in some circumstances be used to estimate that he is subject to the protections of the laws prohibiting age discrimination.

34

by showing that he (1) was a member of a protected class; (2) sought a position for which he was qualified; (3) was not hired; and (4) a substantially younger person who was similarly situated was hired.  *See Sembos v. Philips Components*, 376 F.3d 696, 700 (7th Cir. 2004).

The Defendants allege that Plaintiff cannot establish a prima facie case because (1) he was not qualified for the VP of Claims position; (2) Christian Martin is not substantially younger than the Plaintiff; and (3) Martin is not similarly-situated to the Plaintiff.

The Defendants note that the job description required the successful candidate to have excellent written and verbal communication skills.  They contend that Plaintiff's interview demonstrated that he was long-winded and talked over others.  Moreover, the job description required strong interpersonal skills and the ability to interact with all levels in the organization.  The Defendants allege the Plaintiff's interview demonstrated that he lacked these skills because of his tendency to interrupt the interviewer.  The successful candidate was expected to demonstrate leadership ability.  The Defendants state that Plaintiff's examples of having

a corporate impact by organizing "snickety-snack time" and obtaining headsets for other employees were not the answers that Integrity expected of a successful candidate for VP of Claims.

The Plaintiff disputes the reasons provided by Cindy Heindel as to why he was disqualified. He further claims that Heindel's purported interview notes are not genuine, her reasons have evolved, and he believes she has testified falsely.

The record establishes that Plaintiff had whatever basic qualifications Integrity required to be interviewed for the position. However, employment decisions are often about more than educational or technical requirements. Although the Plaintiff dismisses some of Heindel's asserted reasons for disqualifying him as subjective, it is "entirely appropriate" for an employer to subjectively analyze the "varying traits of each applicant." *See Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005).

Based on Heindel's interview notes, it appears that Integrity had legitimate reasons to disqualify the Plaintiff. The Plaintiff has disputed some of these justifications and contends that Heindel's interview notes are

36

not genuine.[7]    The Defendants provided four reasons, including the Plaintiff's long-windedness, as to why the Plaintiff was disqualified.  Parts of the record appear at least to support the Defendants' proffered justification that Plaintiff is long-winded.  The Plaintiff's response to the Defendants' one-sentence allegation alleging the reasons for disqualification is almost eleven pages.  Moreover, the Plaintiff's initial memorandum in opposition to the Defendants' 29-page memorandum in support of summary judgment is 321 pages.[8]    After his initial memorandum was stricken, the Plaintiff submitted a 90-page memorandum in compliance with the Court's Order.

Additionally, based on the Plaintiff's responses to certain questions, Integrity determined that Plaintiff did not have the skills it was looking for

---

[7]The Court has no reason to doubt that the notes were made at the time of the interview.  Moreover, Heindel's assertion that Plaintiff is long-winded is consistent with Jeff Gipson's February 11, 2010 note regarding the Plaintiff's telephone interview.

[8]Although not known by Integrity at the time of the employment decision, the Defendants allege that Plaintiff has subsequently demonstrated that he is unqualified because he admitted he uses his employer's LEXIS and WESTLAW accounts for his personal lawsuits.  This would be a basis for discharge if the Plaintiff were an Integrity employee.  They also allege that Plaintiff does not have the requisite worker's compensation claims management experience.

as to strategic and visionary thinking, in addition to previous corporate impact.  The Plaintiff does not dispute that he answered the questions as alleged by the Defendants.  Certainly, Integrity was entitled to use such criteria in assessing the various traits of the candidates for VP of Claims. The Court does not sit as a super-personnel department, assessing the wisdom of an employer's decision.  *See Metzger v. Illinois State Police*, 519 F.3d 677, 685 (7th Cir. 2008).

Accordingly, the Court concludes that Plaintiff's age discrimination claim fails because he is unqualified.

The Plaintiff's age discrimination claim fails for the additional reason that Integrity did not hire a substantially younger person.  The requirement that the comparator be substantially younger is based on the simple premise that "an inference [of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger." *Hoffman v. Primedia Special Interest Publications*, 217 F.3d 522, 524 (7th Cir. 2000) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)).  The United States Court of Appeals for the Seventh Circuit

38

has defined "substantially younger" as generally ten years younger.  *See Balderston v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d 309, 322 (7th Cir. 2003) (citing *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997)).

The Plaintiff was 42 when he was rejected for the Integrity VP of Claims position on February 11, 2010, while Christian Martin was 39 when he was hired for that position.  The Seventh Circuit has held the three-year age gap between a 42-year old and 39-year old was insufficient to establish the required element for a prima facie case.  *See Hoffman*, 217 F.3d at 525. In other cases, larger gaps were held to be presumptively insubstantial.  *See Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (seven year age difference); *Hartley*, 124 F.3d at 893 (six-to-seven year age difference).

Although a plaintiff may allege a triable claim upon pointing to other evidence, *see Hartley*, 124 F.3d at 893, the Plaintiff offers nothing more than his own speculation.

Based on the three-year age gap between the selected candidate and the Plaintiff at the time of his interview, the Court concludes that Plaintiff

cannot make out a prima facie case of age discrimination.  The Defendants are entitled to summary judgment because the Plaintiff is not qualified for the position and because Christian Martin was not significantly younger than the Plaintiff when he was hired as VP of Claims.[9]

## C. Retaliation

In order to establish a prima facie case, a plaintiff may proceed under the direct or indirect methods of proof.  *See Milligan v. Board of Trustees of Southern Illinois University*, 686 F.3d 378, 388 (7th Cir. 2012).

### (1) Direct Method

To establish retaliation under the direct method, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  *See Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012).   The Plaintiff admitted during his deposition that he does not have direct evidence of retaliation and that his

---

[9]It is also worth noting that Sue Frantzen, who is substantially older than the Plaintiff, performed the VP of Claims job on an interim basis before being offered the position.  Additionally, Jim Blair was 57 at the time he was offered the position in May 2009.

claim is based on supposition. Therefore, the Court will consider whether the Plaintiff has presented circumstantial evidence of retaliation under the direct method.

The Plaintiff can establish causation at this stage by showing that his protected conduct was "a substantial or motivating factor" why he was disqualified for the position. *See Milligan*, 686 F.3d at 388. A plaintiff may present a "convincing mosaic of circumstantial evidence" that would permit a court to draw an inference of retaliation. *Id*. (internal quotation marks and citation omitted). Such evidence may consist of:

> (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of causation might be drawn, (2) evidence showing that the employer systematically treated other, similarly situated . . . employees better, or (3) evidence that . . . the employer's justification [for the adverse action was] pretextual.

*Id.* at 389 (internal quotation marks omitted). The appropriate focus is "whether the evidence points directly to a discriminatory reason for the employer's action." *Id*.

There can be no causal connection between the protected activity and

the Plaintiff's disqualification from consideration if the Defendants were not aware of the protected activity.  Cindy Heindel testified she had no knowledge of the Plaintiff's lawsuit against Nationwide until his demand letter, 18 months after she claims he was disqualified as a candidate.  In response to the assertion, the Plaintiff states in pertinent part:

> The Plaintiff believes this to be a material false statement by Heindel and the Defendants, one of a great many that they have provided in this case verbally, or by way of sworn documents and/or pleadings.  Evidence provided in this pleading prior thereto, shows that the greatest probability is that the Defendants followed the industry norm and used the Internet to research the Plaintiff, discovered his protected conduct, and then quietly and abruptly disqualified him in October 2010.  Defendants have refused to respond or refute these allegations as to their computer systems and ephemeral data, and this item remains at issue in the currently pending third motion to compel.

See Doc. No. 106, at 49-50.  The Plaintiff's speculation that Defendants researched him simply because he believes that most employers research candidates for employment is not enough to create a genuine factual dispute at this stage of the litigation.  Heindel's testimony about when she first learned of the Plaintiff's Nationwide lawsuit was corroborated by Joe DiMartino's testimony.

42

The Plaintiff theorizes that he remained under consideration for several months after the interview, until October 2010 when Heindel learned of his protected activity and abruptly disqualified him. This is inconsistent with the contemporaneous evidence, which supports the Defendants' assertion that Plaintiff was disqualified after the telephone interview.

The Plaintiff places great emphasis on telephone records which reflect calls between Jeff Gipson's business, James Allen Co., and Cindy Heindel at the approximate time that Plaintiff theorizes he was disqualified from consideration for the VP of Claims position. He notes that the records from September 16, 2010 to October 15, 2010, reveal a total of seventeen calls from Gipson's company to Heindel. In particular, the Plaintiff points to a call on October 6, 2010, that lasted 1:06. According to the Plaintiff, Gipson's brief call to Heindel was made 45 minutes after Gipson had telephoned him to inquire if he was still interested. The telephone records further provide Gipson's telephone call to Heindel on October 11, 2010, lasted 18:00. Apparently, the Plaintiff theorizes that his continued interest

43

and his candidacy was discussed at this time.

Even assuming for a moment the Plaintiff's theory that he was disqualified at a later time, it is still quite a leap to suggest the reason was his prior protected conduct.  The Plaintiff has little other than his own speculation to support that contention.  *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation."). There may be an exception to the general rule when the adverse action occurs "on the heels of the protected activity."  *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) (citation omitted).

If Cindy Heindel or another Integrity official had followed up or requested another interview and thereafter canceled and informed the Plaintiff that he was no longer being considered, then there might possibly be a reasonable inference of retaliation.  However, that did not happen here.  Neither Heindel nor anyone else from Integrity contacted the Plaintiff after his telephone interview.  There is no evidence that Heindel took action based on whatever Jeff Gipson told her about the Plaintiff or

44

anyone else in any phone conversations in October 2010.  There is nothing in the record tending to show that Heindel was still interested in the Plaintiff as a potential candidate for VP of Claims.  In addition to the contemporaneous notes of Heindel and Gipson, these undisputed facts suggest that Plaintiff was not given further consideration.  The fact that Plaintiff alleges he advised employment recruiters of his continuing interest in the position is largely irrelevant.

The Plaintiff has no support for his theory that Heindel conducted research and learned of his prior protected activity eight months after his telephone interview.  It seems highly unlikely that a hiring official would conduct such research on a candidate after having no contact with him in the eight months between February and October.  In attempting to create a genuine issue of material fact, the Plaintiff makes two inferences which appear to be based on speculation – that Heindel or another Integrity official discovered his protected activity in October 2010 and he was subsequently disqualified from consideration.  The Plaintiff's belief he was disqualified at that time, without then being notified, is not alone enough

45

to create a genuine issue of material fact on his retaliation claims.  At this stage, the Plaintiff's speculative inferences and unsupported theories are not enough to survive summary judgment.  *See Harper*, 687 F.3d at 306. Moreover, the Plaintiff's consistent and conclusory assertion that Heindel or others have lied throughout these proceedings is not enough to create a factual dispute regarding whether there was a causal connection between his prior protected activity and the decision to disqualify him.

The Court concludes that because the undisputed material facts, when viewed in a light most favorable to the Plaintiff, show that there is no causal connection between the Plaintiff's lawsuit against Nationwide and Cindy Heindel's decision to disqualify him, the Plaintiff is unable to establish evidence of retaliation under the direct method.

(2) Indirect Method

Under the indirect method, a plaintiff may establish a prima facie case of retaliation by showing that: (1) he engaged in a statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than

similarly situated employees who did not engage in protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006).

For the reasons previously discussed, the Defendants are entitled to summary judgment on the Plaintiff's retaliation claim based on the indirect method. The Plaintiff's retaliation claim fails under the indirect method because the evidence demonstrates that he was not qualified for the VP of Claims position. Christian Martin was not similarly situated to the Plaintiff because Martin was qualified for the position. Therefore, the Plaintiff is unable to show that similarly situated individuals who did not engage in protected activity were treated more favorably.

The Plaintiff is unable to establish a prima facie case of retaliation under the indirect method. Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's retaliation claims.

D. State Law Claims

In Counts VII and VIII, the Plaintiff asserts state law claims for age discrimination and retaliation, pursuant to the Illinois Human Rights Act. "In analyzing employment discrimination actions brought under the

Human Rights Act, [the Illinois] Supreme Court has adopted the analytical framework set forth in United States Supreme Court decisions addressing claims under Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act." *Lalvani v. Illinois Human Rights Comm'n*, 324 Ill. App.3d 774, 789-790 (1st Dist. 2001) (citing *Zaderaka v. Illinois Human Rights Commission*, 131 Ill.2d 172, 178 (1989)).

Having determined that Defendants are entitled to summary judgment on the Plaintiff's federal age discrimination and retaliation claims, the Court concludes summary judgment is warranted in favor of the Defendants on the Plaintiff's state law claims.

E. Additional Matters

Discovery closed on October 10, 2012. The Plaintiff has sought multiple extensions of the discovery period. These motions have been denied. The Court declines to revisit these rulings or extend the discovery period. The Plaintiff has attempted to get around these Orders by ignoring them or pursuing subpoenas in other jurisdictions.

The Plaintiff has filed a motion for discovery sanctions under Rule 37

of the Federal Rules of Civil Procedure, based on the Defendants' refusal to verify interrogatory responses as required by Rule 33(B)(3) of the Federal Rules of Civil Procedure. Because discovery has closed in this case, the Court concludes that Plaintiff has waived this argument. *See In re Sulfuric Acid Antitrust Litig.*, 230 F.R.D. 527, 533 (N.D. Ill. 2005) (party waived discovery objection by bringing it after close of discovery).

Most recently, the Plaintiff has filed an Affidavit to supplement his opposition to the Defendants' summary judgment motion. Because the Affidavit was filed several months after briefing on the summary judgment motion concluded, the Plaintiff's Affidavit will be stricken as untimely.

F. Motion for Sanctions and Supplement

(1)

On August 7, 2012, the Defendants filed a motion for sanctions. On August 16, 2012, the Court held a hearing on that motion. In an Order entered on August 31, 2012, this Court stated that it appeared part of the Plaintiff's legal strategy was "to use the threat of criminal liability and/or ethical sanctions in the hope of obtaining a favorable settlement." *See* Doc.

49

No. 74, at 7.  The Court held any sanctions in abeyance, while warning the Plaintiff that he would be sanctioned if he continued to engage in inappropriate litigation tactics or "conduct that is particularly harassing, contumacious, or for any action which is taken in bad faith." *See* Doc. No. 74, at 15.  The Plaintiff was specifically warned that sanctions could include "the assessment of attorney's fees and costs which are incurred as a result of such conduct." *See id*.

On February 6, 2013, the Defendants filed a motion to supplement their motion for sanctions.  The Plaintiff filed a response on the following day.  In support of their motion, the Defendants allege that since the Court's August 31, 2012 Order, the Plaintiff's litigation tactics have included the following:

> (1) sending Defendants or their counsel more than 200 letters or emails with threats of extensive litigation costs, absurd settlement demands, references to insurance coverage, lengthy legal arguments, and legal predictions that directly contradict this Court's order; (2) repeatedly attempting to harass third-party witness Jeff Gipson by seeking court permission to re-convene Gipson's deposition, file an EEOC Charge against Gipson, and file a federal lawsuit against Gipson in direct contradiction of this Court's repeated orders; (3) threatening to contact the U.S. Attorney's Office, EEOC, IDHR, OCRC,

Illinois ARDC, and Wisconsin OLR to "supplement" his previous filings which this court has already deemed harassing; (4) attempting to proceed with depositions of third-party witnesses that this court explicitly prohibited, including a failed pursuit to enforce subpoenas in the Eastern District of Wisconsin; (5) explicitly disobeying Magistrate Judge Cudmore's order limiting the topics on which Grange's Vice President, Peter McMurtrie, could be deposed; (6) attempting to enlarge discovery through frivolous motions to compel, requests to Defendants, and proceedings in related litigation in contradiction of this Court and Magistrate Judge Cudmore's orders; (7) filing an oppressively large response to Defendants' Motion for Summary Judgment that was stricken by the Court; (8) attempting to appeal this Court's Order on the parties' cross-motions to dismiss to the Seventh Circuit, despite recognizing that no final order has issued and a Rule 54(b) motion was likely to fail; (9) filing a Notice of Appeal and Docketing Statement along with approximately 600 pages of exhibits seeking Seventh Circuit review of this Court's orders in relation to Gipson; and (10) threatening to commence and actually commencing additional litigation against Defendants and third parties.

*See* Doc. No. 118, at 2-3.

The Defendants contend that Plaintiff's purpose in pursuing this litigation has been to escalate defense costs through numerous filings in the hope that he could turn baseless claims into a large settlement. In an August 4, 2012 email to Defense Counsel which is attached to the Defendants' Memorandum, the Plaintiff suggested that Counsel did not

51

appear to be particularly knowledgeable about the relevant law and hinted at a lengthy battle, which included the potential for damages to their reputation and criminal liability.   Indeed, before the first motion for sanctions was filed, the Plaintiff sent an email to Counsel predicting a "firey [sic] pit of legal process," which would include a "tremendous amount of pleading, time, expense and stress for myself and my family." *See* Doc. No. 119, Ex. 1.  With those words, the Plaintiff appeared to reveal his strategy.

Two days later, the Plaintiff followed up with another email wherein he advised Counsel of the relevant balancing of interests inquiry in determining whether settlement would be appropriate from a Defense perspective.

Of course, the August 2012 email communications were before the Hearing and the Court determined it would hold sanctions in abeyance. A review of the record shows that Plaintiff has continued to employ similar litigation tactics since August 31, 2012.

(2)

In their motion to supplement, the Defendants allege that the

52

overriding theme in the more than 200 letters or emails that Plaintiff has sent Defense Counsel since September 12, 2012 is that unless they settle, the Defendants and Defense Counsel will subject themselves to sanctions, disbarment and the continued escalation of defense costs.  In his response to the Defendants' supplemental motion for sanctions, the Plaintiff does not directly address these tactics.

Notably, in a December 23, 2012 email to Counsel, the Plaintiff promised to appeal should the Court grant the Defendants' motion for summary judgment.  The Plaintiff opined that the Court's future Order would have "between five and ten points" of "material error," even though that Order referred to is only now being entered more than three months later.

In a letter dated December 31, 2012, the Plaintiff provided his commentary on how this case and the related litigation he had initiated was proceeding.  The Plaintiff stated that if any case were to be dismissed, he would promptly appeal and expects a favorable ruling from the reviewing court.  He then opined that the "winners" in this litigation have been the

law firms, stating that he believes "many thousands of dollars of legal expense" have been invoiced or soon will be by the Defendants in connection with this case. The Plaintiff predicted that the "defense attorneys will continue to bill tremendous amounts" and that settlement was in their best interest.

The Plaintiff's running commentary as to this and related litigation along with the threats that typically accompany such correspondence is the type of harassing communication that Plaintiff was directed by this Court to cease. The Plaintiff has not been deterred.

In a January 17, 2013 email, the Plaintiff recommends to Counsel for the Defendant how they should respond to his motion for final judgment under Rule 54 of the Federal Rules of Civil Procedure. According to the Plaintiff, the Defendants should not oppose his motion. He then offers this thoughts on how the Seventh Circuit will view the conduct of Counsel, the Defendants and that of related parties the Plaintiff has brought in to – or sought to – add to this litigation. The Plaintiff claims that among other acts of misconduct and retaliation, there has been perjury, withholding of

54

evidence and the destruction of evidence.  The Plaintiff further opines on the likelihood of eventual review in the United States Supreme Court.  He concludes by stating, "The facts as to the Defendants conduct, and that of their agents and attorneys seems so utterly egregious that these cases may well become textbook examples of what not to do, serving as a warning and lesson for Defendants for many years to come."  *See* Doc. No. 119, Ex. 9.

In a letter dated January 27, 2013, the Plaintiff wrote to Counsel for the Defendants.  The Plaintiff noted the several litigation fronts he was pursuing, which included: (1) this initial litigation; (2) the Ohio litigation against the Defendants' in-house counsel; (3) the second litigation in this Court involving the same parties; (4) his request to sue Jeff Gipson in Missouri; and (5) his pursuit of a charge with the EEOC alleging the Defendants retaliated against him by filing a counterclaim, even though the Court already dismissed his retaliation claim.  In the letter, the Plaintiff generally summarized the status of each matter, assessed his chances for success, and stated his intention to pursue the matters further in the event of an unfavorable ruling.   He also made a settlement demand.

In a letter dated February 6, 2013, the Plaintiff again made what he described as "an attempt to conclude a legal dispute." As is his custom, the Plaintiff discussed the several matters pending. He predicted what he thought might occur and stated what he would do if the matter were not resolved in his favor. The Plaintiff noted one appeal that is now pending and further stated in part:

> [M]y *Docketing Statement* contains a full history of the case, including Orders which I fell [sic] will likely not withstand appellate review, which show the Defendants and their attorneys to be the aggressors (and not the victims they attempt to portray themselves as). Additionally, given the well documented (and mostly undisputed) history of apparent false pleadings, false swearing, spoliation of evidence, and/or other apparent misconduct, such a review allows the appellate court to consider whether or not the district court appears to have allowed any sort of bias to creep into its decision-making, and/or if the appellate court should act *sua sponte* to sanction the Defendants and/or their attorneys under Rule 11, Rule 37, § 1927 and/or the inherent authority of the court(s) for what could reasonably [be] argued as having "defiled" the "temple of justice," if the appellate court agrees that one or more frauds have been practiced upon the district court and/or the Plaintiff, by the Defendants and/or their attorneys.

> \* \* \*

> As you know I also reached out to EEOC this morning as to check on the status of charge number 440 2013 00137. EEOC

advised that they will send me a copy of the right to sue on that matter so as to complete the documentary history as to the charge related to the subsequent retaliatory action of filing what appears to be completely frivolous counterclaims, likely intended as an act of harassment and/or intimidation (an "abuse of process") rather than as a legitimate cause of action. Assuming the causes are revived by the appellate, I will likely seek leave to amend and to add abuse of process causes to our action. It is hard to imagine that the court could deny such a request in light of its ruling and justification on the Defendants' (Counterclaim Plaintiffs') counterclaim.

*See* Doc. No. 119, Ex. 19.

The foregoing communications demonstrate that Plaintiff did not take the Court seriously when he was placed on notice of the possibility of sanctions if his harassing litigation tactics and intimidation continued. While the Plaintiff may label his correspondence as attempts to amicably resolve a dispute, the letters are typically condescending and sometimes include criminal and ethical accusations.

(3)

There is evidence that Plaintiff has ignored the Court's Orders in an effort to harass witnesses. In its August 31, 2012 Order, the Court determined that Plaintiff had intimidated third-party witness Jeff Gipson

57

in a "rather blatant attempt to persuade [Mr. Gipson] to change his testimony." *See* Doc. No. 74, at 8, 10-11. The Plaintiff was directed to stop this harassment. The Plaintiff filed a motion to re-depose Mr. Gipson, which was denied. The Plaintiff was barred from any contact with Mr. Gipson and from filing any further discovery motions related to him. On two more occasions in a three-month period, the Plaintiff sought leave to pursue a lawsuit against Gipson and his company. On February 4, 2013, the Court denied the Plaintiff's most recent motion and determined that "[b]ased on the Plaintiff's flagrant disregard of its Orders, it appears that sanctions may now be appropriate."

On October 17, 2012, Magistrate Judge Cudmore held that Grange's Vice President, Peter McMurtrie, could be deposed but the deposition would be limited "to his knowledge of events related to the hiring process for the Position before August 4, 2011." *See* Doc. No. 87, at 22. Three days later, the Plaintiff wrote to Counsel and stated that he believes "Judge Cudmore is misinterpreting prevailing precedent on this issue." *See* Doc. 119, Ex. 13. Therefore, the Plaintiff asked Counsel not to insist upon strict

compliance with the prohibition on questions regarding events occurring after August 4, 2011. Counsel stated that they would be requiring strict compliance. Instead of limiting the deposition as directed, the Plaintiff in an email sent on October 29, 2012, suggested he would be asking questions outside the scope of the Court's Order, and threatened "sanctions and/or a contempt of court finding" if the Defendants protested. *See* Doc. No. 119, Ex. 4. The Defendants allege the Plaintiff spent most of Mr. McMurtrie's deposition asking questions well outside the scope of the October 17, 2012 Order, including questions regarding McMurtrie's subordinates' settlement authority and his knowledge of 2012 job postings.

The Defendants further allege that Plaintiff set up his personal video camera for the deposition in order to record Mr. McMurtrie and Counsel both during the deposition and off the record. In response to the Defendants' objection, the Plaintiff explained that although the Court "may or may not" permit him to use such a recording, the purpose of the video recording was to "keep everyone in line." This could be interpreted as a further attempt at intimidation.

In his response to the motion to supplement, the Plaintiff does not specifically address his disregard of Court Orders which has been apparent throughout this litigation.

(4)

The Defendants allege that Plaintiff sent subpoenas and emails to Sheri Treu and Mary Jo Buchberger, who are former employees of the Defendants, seeking to depose them after the close of discovery.   On October 17, 2012, Judge Cudmore denied the Plaintiff's motion to extend discovery and his request to depose Treu and Buchberger.

The following day, the Plaintiff moved for the issuance of the subpoenas for Treu and Buchberger in the Eastern District of Wisconsin. On November 9, 2012, the Court issued an Order denying the Plaintiff's second motion to compel in its entirety, thereby denying again his request for depositions of Treu and Buchberger.   In the Order Judge Cudmore stated, "Nieman is ordered to withdraw any subpoenas he may have secured or served for his proposed additional depositions." *See* Doc. No. 96, at 1-2.

The Defendants claim that when Plaintiff did not move to withdraw

60

his subpoenas for Sheri Treu and Mary Jo Buchberger, they informed the Eastern District of Wisconsin of this Court's November 9, 2012 Order directing him to do so. Although a less litigious litigant might then have determined it would be prudent to comply with the Court's Order, the Plaintiff still did not withdraw his subpoenas.

On November 14, 2012, the Plaintiff filed with the Eastern District of Wisconsin his Supplemental Response and Opposition to Quash Subpoenas of Mary Jo Buchberger and Sheri Treu. In support of that motion, the Plaintiff states: (1) "the Defendants have not provided any legitimate reason to oppose these depositions," *see* Doc. No. 119, Ex. 15, at 6; (2) "if the Plaintiff moved to depose witnesses Treu and Buchberger, in light of the current discovery status in the Central Illinois action, it is most probable that he would be precluded from admitting them into evidence, either as a sanction, or because such evidence would have been deemed to have been first secured outside of the confines of the *Scheduling Order*," *see* Ex. 15, at 7; (3) "As previously noted, Ms. Buchberger and Ms. Treu will not speak to the Plaintiff and their refusal specifically seems to be related

to control by and/or fear of the Defendants and/or their attorneys," *see* Ex. 15, at 9; (4) "But the question as to whether or not he will be permitted to do so, and will be permitted to introduce such evidence into the record in the Central Illinois action(s) is far from resolved," *see* Ex. 15, at 10; (5) "The [Eastern District of Wisconsin] could choose to do nothing and leave the subpoenas intact.  The Plaintiff has promised not to serve them and not to set depositions unless the Court in Illinois approves this action as part of discovery in the pending action(s).  The Plaintiff has done nothing to give this Court reason to doubt his word."  *Id*.

Although the Plaintiff claims that he took no further action on the matter after Judge Cudmore denied his motion to compel on November 9, 2012, the Plaintiff's supplemental response and opposition to the Defendants' motion to quash subpoenas of Treu and Buchberger was filed in the Eastern District of Wisconsin on November 14, 2012.  Thus, the Plaintiff decided it was appropriate to file a 12-page supplemental response when the Defendants advised the court in Wisconsin of Judge Cudmore's ruling.

These actions suggest that Plaintiff will go to extraordinary lengths in attempting to find ways around this Court's Orders. Moreover, the actions provide support to the Defendants' assertion that part of the Plaintiff's litigation strategy is to escalate this litigation and drive up defense costs in an attempt to obtain a favorable settlement.

The Eastern District of Wisconsin granted the Defendants' motion to quash, finding in part, "it appears that Plaintiff is seeking to circumvent the trial court's order by conducting discovery after the time to do so has expired." *See* Doc. No. 119, Ex. 16.

The Defendants further allege that despite the close of discovery, the Plaintiff has flagrantly disregarded Court Orders in seeking discovery of the Defendants' employees' LinkedIn accounts.[10] The Plaintiff continues to pursue a subpoena in the Northern District of California for LinkedIn

---

[10]The Plaintiff's theory appears to be that an individual can set up a LinkedIn account, anonymously search profiles and subsequently delete his or her own account and information. Based on the typical LinkedIn profile, the individual may then be able to use information learned from the search to determine a person's race, gender, national origin, associations, undergraduate and other graduation dates, in addition to other items. While acknowledging this probably was not LinkedIn's intent, the Plaintiff claims that the business model "has created a set of circumstances that is tailor made for discrimination and abuse." *See* Doc. No. 119, Ex. 18.

records related to the Defendants' employees or former employees.  In an email to counsel for LinkedIn, the Plaintiff lists thirteen current and former employees whose LinkedIn information he seeks.  Apparently, he believes that these individuals – most of whom were not involved in any employment decision involving the Plaintiff – viewed his Linked In profile and determined he is over the age of 40 and/or has filed previous lawsuits.

There are no legitimate reasons to seek any of this information after the close of discovery.  Regardless of whether his motive is to harass individuals who are not involved in this litigation or to escalate Defense costs, the Plaintiff's continued disregard of Court Orders has subjected him to sanctions.

(5)

In support of the motion to supplement, the Defendants claim that not only is the Plaintiff continuing to assert claims that have been dismissed, it is apparent he intends to multiply the litigation by adding new counts, claims, and charges.  They allege the Plaintiff has filed a supplemental charge with the EEOC in relation to the retaliation claims

dismissed on January 16, 2013.  In an email sent to EEOC officials, the Plaintiff requested an update on whether a Right to Sue Letter would issue and whether the Defendants would be required to submit a position statement.  The Plaintiff also sent a copy of the Court's Order on the Parties' cross-motions to dismiss to the EEOC, wherein he included legal argument in the body of the email as to why he believes the Court's ruling was wrong.

The Defendants believe that Plaintiff is playing a game with the court system.  They allege he has not taken the Court's previous warnings seriously.  It appears that Plaintiff believes he is immune from sanctions.

The Defendants further allege they will be greatly prejudiced if the Plaintiff's resources are inequitably distributed if he is sanctioned in any of his other lawsuits.  They note that Chief Judge Shadid is considering an attorney's fees sanction award against the Plaintiff in *Nieman v. RLI Corp., et al.*, 1:12-CV-1012.

The Defendants further assert that Plaintiff is not like most *pro se* litigants, as this Court has observed.  Based on his job as a litigation and

65

claims manager, the Plaintiff has significant federal court experience.  The Court has noted that he appears to be familiar with federal court procedure and the law that is applicable to his cases.

The Defendants further allege that Plaintiff has significant resources. He testified that his current salary is $119,000.  The Plaintiff also testified he is allowed to use WESTLAW and LEXIS to work on his personal lawsuits during business hours.

For all of these reasons, the Defendants ask the Court to grant sanctions against the Plaintiff and Order him to pay the Defendants' attorney's fees incurred since August 16, 2012, the date of the hearing on their motion for sanctions.  The Defendants further request that the Court enter a permanent injunction prohibiting the Plaintiff from filing any additional claims, counts, complaints, or charges with any federal, state or administrative court or agency against the Defendants, the Defendants' employees or agents, including their attorneys.

(6)

The Plaintiff's litigation conduct in recent months appears to be an

attempt to make good on his prediction in early August 2012 of a "firey [sic] pit of legal process."  In his response to the Defendant's motion, the Plaintiff alleges he has been severely restricted in discovery and there are factual questions that preclude the entry of summary judgment.  He further suggests that Defendants and their attorneys have attempted to destroy the Plaintiff and his family financially and perhaps emotionally.  The Plaintiff does not really respond to the Defendants' allegations which pertain to his litigation conduct.  His litigation strategy is apparent from his own words.

The Plaintiff's litigation strategy is evident from his pleadings and some of the more than 200 letters and emails that Plaintiff has sent to Counsel in the last six months.  The Plaintiff's correspondence includes threats of extensive litigation, outrageous settlement demands, predictions of success in his several cases, and numerous threats of sanctions and criminal liability.  These are the Plaintiff's own words, which he does not dispute.  The Plaintiff's conduct and words make clear his intention is to harass the Defendants to such an extent that they will pay him to stop.  It is time for his sordid litigation scheme to end.

Although the "American Rule" prohibits the shifting of fees in most cases, there are a few instances in which courts have the inherent power to assess attorney's fees. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). One example is that a court may assess attorney's fees for the "willful disobedience of a court order." *Id*. (internal quotation marks and citations omitted). The Court has cited multiple examples of such willful disobedience by the Plaintiff, including his conduct during the deposition of Peter McMurtrie and his continuous pursuit of subpoenas for Sheri Treu and Mary Jo Buchberger. He has continued to willfully disobey the Court's previous Order on sanctions.

A court may also assess attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id*. at 45-46 (internal quotation marks and citations omitted). This is an appropriate description for much of the Plaintiff's conduct throughout this litigation. In his correspondence, the Plaintiff has all but told the Defendants that he would not be deterred until they paid him to go away. The Plaintiff's scheme has included, *inter alia*, vexatious filings and communications, the

68

harassment and intimidation of non-parties, the pursuit of discovery in other courts, threats of legal liability and/or ethical sanctions, including Counsel's disbarment.

Based on the Plaintiff's bad faith and abuse of process, the Court concludes that an award of attorney's fees is warranted in this case.

It was on August 31, 2012 that the Court entered an Order Denying in Part the Defendants' Motion for Sanctions, while holding the motion it in abeyance. The Court will consider imposing an award of the Defendants' reasonable attorney's fees. The Defendants will be directed to supplement the record with their detailed billing records since September 4, 2012, which is the first business day after the Court entered its previous Order. The Defendants shall supplement the record within 14 days. The Plaintiff may respond within 14 days of the Defendants' filing.

## IV. CONCLUSION

The Plaintiff has not properly disputed the material facts offered in support of the Defendants' motion for summary judgment. The Plaintiff's hunches about the Defendants' motives and baseless accusations about the

69

conduct of the Defendants, their employees and their attorneys are not enough at to proceed at this stage of the litigation, which is "the put up or shut up moment in a lawsuit." *See Springer*, 518 F.3d at 484. The Plaintiff's age discrimination claims fail for a number of reasons. His retaliation claims were based entirely on speculation. Accordingly, the Defendants are entitled to summary judgment.

Finally, the Plaintiff's flagrant disregard of Court Orders and his harassing and contumacious conduct in the hope of obtaining a settlement has subjected the Plaintiff to sanctions.

<u>Ergo</u>, the Defendants' Motion for Summary Judgment as to all claims [d/e 92] is ALLOWED.

The Plaintiff's Motion for Leave to File a Sur-reply [d/e 109] is ALLOWED.

The Plaintiff's Third Motion to Compel Discovery Responses and Second Motion for Discovery Sanctions [d/e 90] is DENIED.

The Plaintiff's Motion to Compel Sworn Verifications as to Previously Submitted Interrogatory Responses [d/e 124] is DENIED.

The Plaintiff's Affidavit in support of his Summary Judgment Opposition [d/e 126] is STRICKEN.

The Defendants' Motions for Sanctions and to Supplement their Motions for Sanctions [d/e 62, 118] are ALLOWED.

The Defendants shall within 14 days of the entry of this Order supplement the record with their detailed billing records since September 4, 2012. The Plaintiff may respond 14 days thereafter.

ENTER: April 2, 2013

FOR THE COURT:

*s/Richard Mills*
s/Richard Mills
United States District Judge

71